TO BE FILED UNDER SEAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| vs. ) | Case No. 3:13cr63 |
| ) | Judge ___/___ |
| ARNOLD RALENKOTTER, ) | |
| Defendant. ) | |

## PLEA AGREEMENT

The United States of America, by the United States Attorney for the Eastern District of Tennessee, and the defendant, Arnold Ralenkotter, and the defendant's attorney, Edward M. Yarbrough, have agreed upon the following:

1. The defendant will waive indictment and arraignment and plead guilty to an information charging the defendant with one count of conspiracy to commit mail fraud and wire fraud in violation of 18 U.S.C. § 1349.

The punishment for this offense is as follows: up to twenty (20) years imprisonment, a fine of not more than $250,000, not more than three (3) years supervised release, and a mandatory assessment of $100, in addition to any applicable forfeiture and restitution.

2. The defendant has read the information, discussed the charges and possible defenses with defense counsel, and understands the crime charged. The defendant is pleading guilty because the defendant is in fact guilty. In order to be guilty of the offense of conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. § 1349, as charged in the information, the defendant agrees that each of the following elements of the crime must be proved beyond a reasonable doubt:

a) that there existed an agreement between two or more persons to commit (i) mail fraud, an offense against the United States, that is, with the intent to defraud, to knowingly devise

and intend to devise and to participate in a scheme and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations, and omissions, and for the purpose of executing such scheme and artifice, knowingly causes any matter or thing to be sent and delivered by mail or commercial interstate carrier, in violation of 18 U.S.C. § 1341; and (ii) wire fraud, an offense against the United States, that is, with the intent to defraud, to knowingly devise and intend to devise and to participate in a scheme and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations, and omissions, and for the purpose of executing such scheme and artifice, to cause to be transmitted by means of wire in interstate commerce, writings, signs, and signals, in violation of 18 U.S.C. § 1343.

  b. that the defendant knowingly and voluntarily joined and participated in the conspiracy; and

  c. that an overt act was committed by at least one conspirator in furtherance of the conspiracy.

  3. In support of the defendant's guilty plea, the defendant agrees and stipulates to the following facts, which satisfy the offense elements. These are the facts submitted for purposes of the defendant's guilty plea. They do not necessarily constitute all of the facts in the case. Other facts may be relevant to sentencing. Both the defendant and the United States retain the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case.

  a. Since before 2008, Pilot Corporation and Pilot Travel Centers, LLC, (collectively referred to as "Pilot"), headquartered in Knoxville, Tennessee, have operated travel plazas throughout the United States and have served as one of the largest suppliers of diesel fuel to over-the-road trucking companies in the country. Through its "direct sales" division, which consists of national and regional vice presidents, sales directors, sales managers, account representatives, and

2

others, Pilot induces its trucking company customers to purchase its diesel fuel by offering various incentives, including diesel fuel price discounts.

b. Defendant Ralenkotter has been employed in Pilot's direct sales division for more than ten years. Since before 2008, Defendant Ralenkotter has served as a regional sales director in Pilot's direct sales division. As a regional sales director, Defendant Ralenkotter has personally negotiated, and managed other regional sales managers and account representatives in their negotiations of, diesel fuel price discounts in various forms to over-the-road trucking companies for the purpose of inducing those companies to purchase diesel fuel for commercial use from Pilot's numerous travel plazas throughout the United States, instead of purchasing diesel fuel from Pilot's competitors.

c. Typically, Pilot's diesel discount deals have involved one of three options: "retail-minus" pricing, "cost-plus" pricing, or a combination of the two known as "better-of" pricing. For its retail-minus discount deals, Pilot has typically agreed to provide the customer with a discount equal to the retail gallon price of diesel minus a negotiated "x" cents. For its cost-plus discount deals, Pilot has typically agreed to provide the customer with a discount price equal to Pilot's "cost" for a gallon of diesel plus a negotiated "x" cents. However, under its cost-plus discount deals, Pilot's *actual* cost has not been the benchmark used for Pilot's "cost" in cost-plus discount deals. Rather, Pilot's "cost" in its cost-plus discount deals typically has been determined by the Oil Price Information Services' ("OPIS") wholesale rack price for a specific OPIS rack or racks tied to the particular Pilot travel plaza where the diesel fuel was purchased. For better-of pricing discount deals, the customer has both a retail-minus deal and a cost-plus deal in place for specified Pilot travel plazas, and the customer receives whichever discount is greater at the time of each diesel purchase – the cost-plus price or the retail-minus price.

3

d.  Whether a customer has negotiated a "retail minus 'x' cents" discount, a "cost plus 'x' cents" discount, or a "better of" pricing discount, the customer may choose to receive its discount generally in two ways - "off-invoice" or by way of a monthly rebate check. Customers who receive their discount "off-invoice" from Pilot generally purchase their diesel from Pilot on credit, and regularly receive invoices from Pilot for those purchases. For those customers, their agreed-upon discount should be applied to determine the periodically invoiced amount. For Pilot customers who choose to receive their discount in the form of a rebate, Pilot's retail price for diesel at the point and time of sale is charged to the customer, and then at the end of the month, the customer's negotiated discount is applied to all of the customer's purchased gallons for the month, so that the customer's aggregated price discount for the month is provided in the form of a rebate check.

e.  What has been complicated for many Pilot customers is that the discount deals offered by Pilot typically vary among Pilot's numerous travel plazas, and the OPIS rack-price benchmark that Pilot uses as its "cost" for "cost-plus" pricing can also vary from travel plaza to travel plaza. There are hundreds of OPIS "racks" generating "rack-prices" on a daily basis for hundreds of travel plazas. Put another way, due to the multiple variables at play in the diesel discount deals offered by Pilot to its customers, it can be challenging for customers to track whether they are in fact receiving the full amount of their agreed upon price discount from Pilot.

f.  From approximately 2008 through approximately April 2013, Defendant Ralenkotter agreed and conspired with other Pilot employees to deceptively withhold discounts from Pilot customers, first through the deceptive reduction of monthly rebate amounts, and ultimately by deceptively lowering the off-invoice discounts of customers who were unlikely to catch the off-invoice discount reduction and who purchased fuel at Pilot travel plazas where Pilot had limited competition.

4

g.  From approximately 2008 through approximately April 2013, Defendant Ralenkotter deceptively withheld rebates amounts from Pilot customers in the following manner. Each month Defendant Ralenkotter's inside regional account representative who worked at Pilot headquarters in Knoxville, Tennessee, and was therefore referred to an "inside" regional account representative, sent a spreadsheet by way of interstate wire transmission, namely an e-mail to Defendant Ralenkotter who worked remotely in Hebron, Kentucky, that identified the actual rebate amounts that Defendant Ralenkotter's customers should receive pursuant to their discount agreements and recommended amounts by which to deceptively reduce the targeted customers' rebates without telling the affected customers. Defendant Ralenkotter would then approve, or sometimes further reduce, his inside regional account representative's recommended rebate reductions. After Defendant Ralenkotter approved the amounts of the fraudulent rebate reductions, Defendant Ralenkotter's inside regional sales representative would cause rebate checks in the deceptively reduced amounts to be mailed or sent by commercial carrier to the targeted customers.

h.  On one occasion between 2008 and 2013, Defendant Ralenkotter told a subordinate that if he was not willing to deceptively reduce a customer's rebate, then Defendant Ralenkotter would take the customer's account from him.

i.  On October 25, 2012, during a business meeting of Pilot sales directors, Defendant Ralenkotter expressed, in the presence of other sales directors, his mutual agreement to defraud certain Pilot customers by deceptively withholding the full amount of the agreed-upon rebate amount to some customers when the actual rebate that Pilot owed the customer for a current month substantially exceeded the rebate Pilot paid the customer for the immediately preceding month.

j.  On October 25, 2012, Defendant Ralenkotter also expressed his intent to defraud Pilot customers by bragging to other Pilot direct sales employees that for the purpose of preventing a

5

Pilot customer from taking its business to another customer, he lied to that customer and told that customer that Pilot would give the customer a better discount deal than the customer had previously been receiving, well knowing that he, Defendant Ralenkotter, had no intention of actually giving that discount to the customer, and in fact did not give that promised discount to the customer.

k. During the same October 25, 2012 business meeting of Pilot sales directors, it was agreed among those present that Pilot's national accounts sales director would teach Pilot's sales managers and account representatives manual rebate practices during Pilot's annual sales training event at Pilot headquarters planned for November 2012.

l. On November 19 and 20, 2012, Pilot held a mandatory sales-training meeting for the company's diesel direct sales division at its headquarters located at 5508 Lonas Drive, Knoxville, Tennessee. During this training meeting, Defendant Ralenkotter attended a break-out teaching session in which Pilot's national accounts sales director, in furtherance of the conspiracy to commit mail and wire fraud, encouraged and taught Pilot direct sales personnel how to defraud, without detection, some of Pilot's customers who choose to receive their discount in the form of a rebate check. This Pilot sales director who gave this instruction encouraged the use of a spreadsheet in a manner similar to the process described above in Paragraph 3.g.

m. By February 2013, the conspiracy to commit mail and wire fraud in which Defendant Ralenkotter and other Pilot employees were participating had evolved to the point that Defendant Ralenkotter was working with other Pilot employees toward identifying customers (i) who purchased diesel from Pilot in locations where Pilot had no direct competition and (ii) who also would not likely be able to notice a change in their off-invoice discount, so that he and his coconspirators could deceptively reduce the off-invoice discount amounts for those customers without the customers' knowledge, which Defendant Ralenkotter referred to as "jacking" the

6

discount during a February 22, 2013 conversation that Defendant Ralenkotter had with another Pilot direct sales employee.

n. From 2008 through April 2013, Defendant Ralenkotter, in violation of 18 U.S.C. § 1349, conspired and agreed with other Pilot employees to commit (i) mail fraud, an offense against the United States, in violation of 18 U.S.C. § 1341, that is, for the purpose of obtaining money from Pilot customers, by means of materially false pretenses, false representations, and omissions, and with the intent to defraud, Defendant Ralenkotter caused and approved the sending of fraudulently reduced rebate checks and fraudulently determined invoice amounts by mail and commercial interstate carriers to certain targeted Pilot customers, and (ii) wire fraud, an offense against the United States in violation of 18 U.S.C. § 1343, that is, with the intent to defraud, Defendant Ralenkotter knowingly devised and intended to devise and to participate in a scheme and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations, and omissions, and for the purpose of executing such scheme and artifice, Defendant Ralenkotter caused to be transmitted by means of wire in interstate commerce, writings, signs, and signals, all so that Pilot could fraudulently retain rebates and discounts that were owed and due to certain Pilot customers, and so that Pilot could create and maintain the materially false pretense that those customers were in fact receiving their agreed upon diesel price discount with Pilot for the purpose of inducing those customers to continue their purchasing of diesel fuel from Pilot, rather than a competitor, and for the purpose of increasing both Pilot's profits and its sales personnel's commissions.

o. Defendant Ralenkotter and his coconspirator Pilot employees caused fraudulently determined rebate check amounts and invoice amounts to be sent to many of Pilot's customers, so that Pilot could fraudulently retain rebates that were owed and discounts that were due to the

7

customers and so that Pilot could create and maintain the false pretense that those customers were in fact receiving their agreed upon diesel price discount with Pilot, for the purpose of inducing those customers to continue their purchasing of diesel fuel from Pilot, rather than a competitor.

  p. The deceptive reduction of a Pilot customer's rebate and discount amount not only induced the customer to continue purchasing diesel from Pilot, but also increased the profitability of the customer's account to Pilot itself and had the potential of increasing the sales commissions of the Pilot direct sales employees assigned to the affected customer's account.

  q. During March 2012, as an overt act in furtherance of the conspiracy to commit mail fraud and wire fraud by defrauding Pilot customers, Defendant Ralenkotter, knowingly and willfully, and with the intent to defraud, caused an interstate wire transmission to be sent, namely the e-mailing of a spreadsheet from Pilot's Knoxville, Tennessee headquarters to Defendant Ralenkotter, who worked remotely in Hebron, Kentucky, that recommended the deceptive reduction of customer rebate amounts, and further caused a deceptively reduced rebate check for the month of February 2012 to be mailed from Pilot's Knoxville, Tennessee headquarters to Pilot's customer Dana Transport in New Jersey.

  r. Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), the United States agrees that for sentencing purposes in this case, that the loss amount for which the United States will seek to hold Defendant Ralenkotter responsible under United States Sentencing Guidelines § 2B1.1 shall be limited to fraudulent rebate and discount reductions personally approved by Defendant Ralenkotter, rather than every fraudulent rebate and discount reduction caused by the entire conspiracy.

  s. Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), the United States agrees that the number of victims that Defendant Ralenkotter should be held responsible under United

States Sentencing Guidelines § 2B1.1(b)(2) for his participation in the conspiracy should be limited to Pilot customers for whom Defendant Ralenkotter personally approved a fraudulent rebate or discount reduction, rather than every customer affected by the conspiracy's fraudulent rebate and discount reductions.

t. The government further agrees, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), that Defendant Ralenkotter's participation in the conspiracy did not involve a sophisticated means.

u. In reaching this agreement, the United States acknowledges that Defendant Ralenkotter is the first Pilot sales director to admit and accept criminal responsibility for conspiring with others, including Pilot's direct sales division employees, to defraud Pilot customers by fraudulently reducing Pilot customer rebates and discounts.

4. The defendant understands that by pleading guilty the defendant is giving up several rights, including:

    a) the right to be indicted by a grand jury for these crimes;

    b) the right to plead not guilty;

    c) the right to a speedy and public trial by jury;

    d) the right to assistance of counsel at trial;

    e) the right to be presumed innocent and to have the burden of proof placed on the United States to prove the defendant guilty beyond a reasonable doubt;

    f) the right to confront and cross-examine witnesses against the defendant;

    g) the right to testify on one's own behalf, to present evidence in opposition to the charges and to compel the attendance of witnesses; and

    h) the right not to testify and to have that choice not used against the defendant.

9

5. The parties agree that the appropriate disposition of this case would be the following as to each count:

    a) The Court may impose any lawful term of imprisonment, any lawful fine, and any lawful term of supervised release up to the statutory maximum;

    b) The Court will impose special assessment fees as required by law; and

    c) The Court may order forfeiture as applicable and restitution as appropriate.

No promises have been made by any representative of the United States to the defendant as to what the sentence will be in this case. Any estimates or predictions made to the defendant by defense counsel or any other person regarding any potential sentence in this case are not binding on the Court, and may not be used as a basis to rescind this plea agreement or withdraw the defendant's guilty plea. The defendant understands that the sentence in this case will be determined by the Court after it receives the presentence report from the United States Probation Office and any information presented by the parties. The defendant acknowledges that the sentencing determination will be based upon the entire scope of the defendant's criminal conduct, the defendant's criminal history, and pursuant to other factors and guidelines as set forth in the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553.

6. The defendant further agrees to cooperate fully, completely, and truthfully with any and all law enforcement agents and personnel of the United States Attorney's Office. This cooperation includes, but is not limited to, meeting with and being interviewed by such law enforcement agents or personnel of the United States Attorney's Office whenever requested. The defendant further agrees not to protect anyone who was truly involved and not to falsely implicate anyone who was not truly involved in the commission of criminal offenses. The defendant further agrees to testify completely and truthfully before a federal grand jury, at any trial, or at any other

proceeding if called upon by the United States to do so. Upon request by the United States, the defendant must furnish all documents, objects and other evidence in the defendant's possession, custody, or control that are relevant to the United States' inquiries. The defendant and defense counsel also knowingly, voluntarily, and intentionally waive the defendant's right (where applicable) to have defense counsel present during the course of cooperation, including questioning or court appearances.

7.      To ensure the defendant's truthful cooperation, the United States agrees, except as provided below, not to use any self-incriminating information provided by the defendant pursuant to this written plea agreement against the defendant. However, nothing in this plea agreement shall restrict the use of any information (1) known to the United States prior to entering into this written plea agreement, (2) obtained from any other source, or (3) concerning the defendant's prior criminal record. Should any of the following occur (1) the defendant provides false or misleading information during the course of the defendant's cooperation, (2) the defendant moves to withdraw the defendant's guilty plea, or (3) the defendant breaches any other of the terms of this plea agreement, then the United States may make use of any information provided by the defendant to law enforcement authorities at any time (including any information provided during formal or informal proffer sessions prior to signing this plea agreement, and any information provided after signing this plea agreement) for any purpose in any subsequent proceeding, including grand jury, trial, and sentencing phases of this case or in any other prosecutions or proceedings against the defendant or others. Moreover, if the United States determines at any time (before or after sentencing) that the defendant has failed to cooperate fully, completely, and truthfully, or otherwise violated any of the terms of this plea agreement, it will be free to withdraw any favorable sentencing motion filed by the United States, including motions filed under U.S.S.G. § 5K1.1

11

and/or 18 U.S.C. § 3553.

    8. At the time of sentencing, the United States may bring to the Court's attention the nature, extent, and value of the defendant's cooperation so that it may be considered in determining a fair and appropriate sentence under the facts of the case.

    9. Given the defendant's agreement to plead guilty, the United States will not oppose a two-level reduction for acceptance of responsibility under the provisions of Section 3E1.1(a) of the Sentencing Guidelines. Further, if the defendant's offense level is 16 or greater, and the defendant is awarded the two-level reduction pursuant to Section 3E1.1(a), the United States agrees to move, at or before the time of sentencing, the Court to decrease the offense level by one additional level pursuant to Section 3E1.1(b) of the Sentencing Guidelines. Should the defendant engage in any conduct or make any statements that are inconsistent with accepting responsibility for the defendant's offense, including violations of conditions of release or the commission of additional offenses prior to sentencing, the United States will be free not to make such motion or to withdraw such motion if already made, and will be free to recommend to the Court that the defendant not receive any offense level reduction for acceptance of responsibility under Section 3E1.1 of the Sentencing Guidelines.

    10. The defendant agrees to pay the special assessment in this case prior to sentencing.

    11. The defendant agrees that the court shall order restitution, pursuant to any applicable provision of law, for any loss caused to the victims of the conspiracy offense charged in this case who were victimized by Defendant Ralenkotter's participation in the charged conspiracy, and any such restitution order shall impose joint and several liability as the court deems appropriate. As required by law, Defendant Ralenkotter's restitution obligation under 18 U.S.C. § 3663A is not limited by Paragraph 3(r) and Paragraph 3(s) above.

12. Financial Obligations. The defendant agrees to pay all fines and restitution imposed by the Court to the Clerk of Court. The defendant also agrees that the full fine and/or restitution amounts shall be considered due and payable immediately. If the defendant cannot pay the full amount immediately and is placed in custody or under the supervision of the Probation Office at any time, the defendant agrees that the Bureau of Prisons and the Probation Office will have the authority to establish payment schedules to ensure payment of the fine and/or restitution. The defendant further agrees to cooperate fully in efforts to collect any financial obligation imposed by the Court by set-off of federal payments, execution on non-exempt property, and any other means the United States deems appropriate. The defendant and counsel also agree that the defendant may be contacted post-judgment regarding the collection of any financial obligation imposed by the Court without notifying the defendant's counsel and outside the presence of the defendant's counsel.

In order to facilitate the collection of financial obligations to be imposed with this prosecution, the defendant agrees to disclose fully all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party. In furtherance of this agreement, the defendant additionally agrees to the following specific terms and conditions:

a) If so requested by the United States, the defendant will promptly submit a completed financial statement to the U.S. Attorney's Office, in a form it provides and as it directs. The defendant promises that such financial statement and disclosures will be complete, accurate, and truthful.

b) The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation

imposed by the Court.

        c)    If so requested by the United States, the defendant will promptly execute authorizations on forms provided by the U.S. Attorney's office to permit the U.S. Attorney's Office to obtain financial and tax records of the defendant.

    13.    (a)    In consideration of the concessions made by the United States in this agreement and as a further demonstration of the defendant's acceptance of responsibility for the offense committed, the defendant agrees not to file a direct appeal of the defendant's conviction or sentence except the defendant retains the right to appeal a sentence imposed above the sentencing guideline range or any applicable mandatory minimum sentence (whichever is greater) determined by the district court.

        (b)    In addition, the defendant knowingly and voluntarily waives the right to file any motions or pleadings pursuant to 28 U.S.C. § 2255 or to collaterally attack the defendant's conviction and/or resulting sentence. The parties agree that the defendant retains the right to raise, by way of collateral review under § 2255, claims of ineffective assistance of counsel or prosecutorial misconduct not known to the defendant by the time of the entry of judgment.

    14.    This agreement becomes effective once it is signed by the parties and is not contingent on the defendant's entry of a guilty plea. If the United States violates the terms of this agreement, the defendant will have the right to withdraw from this agreement. If the defendant violates the terms of this agreement in any way (including but not limited to failing to enter guilty plea as agreed herein, moving to withdraw the guilty plea after entry, or by violating any court order or any local, state or federal law pending the resolution of this case), then the United States will have the right to void any or all parts of the agreement and may also enforce whatever parts of the agreement it chooses. In addition, the United States may prosecute the defendant for any and all federal crimes

14

that the defendant committed related to this case, including any charges that were dismissed and any other charges which the United States agreed not to pursue. The defendant expressly waives any statute of limitations defense and any constitutional or statutory speedy trial or double jeopardy defense to such a prosecution. The defendant also understands that a violation of this plea agreement by the defendant does not entitle the defendant to withdraw the defendant's guilty plea in this case.

15. This plea agreement constitutes the full and complete agreement and understanding between the parties concerning the defendant's guilty plea to the above-referenced charge, and there are no other agreements, promises, undertakings, or understandings between the defendant and the United States. The parties understand and agree that the terms of this plea agreement can be modified only in writing signed by all of the parties and that any and all other promises, representations, and statements whether made before, contemporaneous with, or after this agreement, are null and void.

WILLIAM C. KILLIAN
UNITED STATES ATTORNEY

5/24/2013
Date

By: _____
Francis M. Hamilton III
David P. Lewen, Jr.
Assistant United States Attorneys

May 24, 2013
Date

_____
Arnold Ralenkotter
Defendant

May 24, 2013
Date

_____
Edward M. Yarbrough
Attorney for the Defendant

15