UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| PLAINTIFF, ) | |
| v. ) | No. 3:13-CR-63 |
| ) | JUDGES THAPAR/GUYTON |
| ARNOLD RALENKOTTER, ) | |
| ) | |
| DEFENDANT. ) | |

## WAIVER OF INDICTMENT

ARNOLD RALKENKOTTER, the above-named defendant, who is accused of:

COUNT 1
(Conspiracy to Commit Mail Fraud and Wire Fraud )

At all times material hereto:

1. Pilot Corporation and Pilot Travel Centers, LLC, (collectively referred to as "Pilot"), headquartered in Knoxville, Tennessee, operated travel plazas throughout the United States and served as one of the largest suppliers of diesel fuel to over-the-road trucking companies in the country. Through its "direct sales" division, which consisted of national and regional vice presidents, sales directors, sales managers, account representatives, and others, Pilot induced its trucking company customers to purchase its diesel fuel by offering various incentives, including diesel fuel price discounts.

2. The defendant, ARNOLD RALENKOTTER, has been employed in Pilot's direct sales division for more than ten years. Since before 2008, the defendant, ARNOLD RALENKOTTER, has served as a regional sales director in Pilot's direct sales division. As a

regional sales director, the defendant, ARNOLD RALENKOTTER, has personally negotiated, and managed other regional sales managers and account representatives in their negotiations of, diesel fuel price discounts in various forms to over-the-road trucking companies for the purpose of inducing those companies to purchase diesel fuel for commercial use from Pilot's numerous travel plazas throughout the United States, instead of purchasing diesel fuel from Pilot's competitors.

3. Pilot's diesel discount deals typically have involved one of three options: "retail-minus" pricing, "cost-plus" pricing, or a combination of the two known as "better-of." For its retail-minus discount deals, Pilot typically has agreed to provide the customer with a discount equal to the retail gallon price of diesel minus a negotiated "x" cents. For its cost-plus discount deals, Pilot typically has agreed to provide the customer with a discount price equal to a benchmarked "cost" for a gallon of diesel plus a negotiated "x" cents. A Pilot customer with a "better of" pricing discount deal would have had both a retail-minus deal and a cost-plus deal in place for specified Pilot travel plazas, and the customer would receive whichever discount is greater at the time of each diesel purchase – the cost-plus price or the retail-minus price.

4. Whether a Pilot customer has negotiated a "retail minus 'x' cents" discount, a "cost plus 'x' cents" discount, or a "better of" pricing discount, the customer would choose to receive its discount generally in two ways - "off-invoice" or by way of a monthly rebate check. Customers who chose to receive their discount "off-invoice" from Pilot generally purchased their diesel from Pilot on credit, and regularly received invoices from Pilot for those purchases. For Pilot's "off-invoice" customers, their agreed-upon discount would be applied to determine the periodically invoiced amount. For Pilot customers who chose to receive their discount in the form of a rebate, Pilot's retail price for diesel at the point and time of sale was charged to the customer, and then at the end of the month, the customer's negotiated discount was applied to all

the customer's purchased gallons for the month, so that the customer's aggregated price discount for the month was provided in the form of a rebate check.

5. The diesel fuel price discounts offered by Pilot generally varied among Pilot's numerous travel plazas, and the benchmark that Pilot used as its "cost" for "cost-plus" pricing also varied from travel plaza to travel plaza. Due to the multiple variables of Pilot's diesel price discounts, it was challenging for many of Pilot's customers to track whether they were in fact receiving the full amount of their agreed upon price discount from Pilot.

The Conspiracy and its Object

6. From 2008, through approximately April 2013, within the Eastern District of Tennessee, and elsewhere, the defendant, ARNOLD RALENKOTTER, did knowingly and willfully conspire, combine, confederate and agree with other persons, including Pilot employees,

a. to commit mail fraud, an offense against the United States, that is for the purpose of obtaining money from Pilot customers, by means of materially false pretenses, false representations, and omissions, and with the intent to defraud, the defendant, ARNOLD RALENKOTTER, caused and approved the sending of fraudulently reduced rebate checks and fraudulently determined invoice amounts by mail and commercial interstate carriers to certain targeted Pilot customers, in violation of Title 18, United States Code, Section 1341; and

b. to commit wire fraud, an offense against the United States, that is, with the intent to defraud, the defendant, ARNOLD RALENKOTTER, knowingly devised and intended to devise and to participate in a scheme and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations, and omissions, and for the purpose of executing such scheme and artifice, the defendant, ARNOLD RALENKOTTER, caused to be transmitted by means of wire in interstate commerce, writings, signs, and signals, in violation of Title 18, United States Code, Section 1343.

## The Purpose of the Conspiracy

7. The primary purpose of the conspiracy was to send fraudulently reduced rebate check amounts and fraudulently increased invoice amounts to some of Pilot's trucking company customers, so that Pilot could fraudulently retain rebates and discounts that were owed to those customers and so that Pilot could create and maintain the false pretense that those customers were in fact receiving their agreed upon diesel price discount with Pilot, to induce those customers, by means of materially false pretenses, false representations, and omissions, to continue their purchasing of diesel fuel from Pilot, rather than a competitor, and thereby increase the profitability of the targeted customers' accounts to Pilot itself and increase the sales commissions of Pilot's direct sales employees assigned to the targeted customers' accounts.

## Manner and Means of the Conspiracy

8. It was part of the conspiracy that a regional account representative, who was assigned to work with the defendant, ARNOLD RALENKOTTER, and who worked at Pilot headquarters in Knoxville, Tennessee, and was therefore referred to an "inside" regional account representative, would send a monthly spreadsheet by way of interstate wire transmission, namely an e-mail to the defendant, ARNOLD RALENKOTTER, who worked remotely in Hebron, Kentucky, that identified the actual rebate amounts that the defendant, ARNOLD RALENKOTTER's, customers should receive pursuant to their discount agreement and recommended amounts by which to deceptively reduce the targeted customers' rebate amounts without telling the affected customers.

9. It was part of the conspiracy that the defendant, ARNOLD RALENKOTTER, would then approve, or sometimes further reduce, the recommended deceptive rebate reductions stated on his inside regional account representative's e-mailed spreadsheet.

10. It was part of the conspiracy that after the defendant, ARNOLD RALENKOTTER, approved the amounts of the fraudulent rebate reductions, the defendant, ARNOLD RALENKOTTER's, inside regional sales representative would cause rebate checks in the deceptively reduced amounts to be mailed or sent by commercial carrier to the targeted customers.

11. It was part of the conspiracy that the defendant, ARNOLD RALENKOTTER, told a subordinate that if that subordinate was not willing to deceptively reduce a customer's rebate, then the defendant, ARNOLD RALENKOTTER, would take the customer's account from the subordinate.

12. It was part of the conspiracy that during an October 25, 2012 business meeting of Pilot sales directors, which the defendant, ARNOLD RALENKOTTER, attended it was agreed among those present that Pilot's national accounts sales director would teach Pilot's sales managers and account representatives manual rebate practices during Pilot's annual sales training event at Pilot headquarters planned for November 2012.

13. It was part of the conspiracy that on November 19 and 20, 2012, Pilot held a mandatory sales-training meeting for the company's diesel direct sales division at its headquarters located at 5508 Lonas Drive, Knoxville, Tennessee. During this training meeting, the defendant, Arnold Ralenkotter, attended a break-out teaching session in which Pilot's national accounts sales director, in furtherance of the conspiracy to commit mail and wire fraud, encouraged and taught Pilot direct sales personnel how to defraud, without detection, some of Pilot's customers who choose to receive their discount in the form of a rebate check.

14. It was part of the conspiracy that by February 2013, the defendant, ARNOLD RALENKOTTER, was working with other Pilot employees toward identifying customers (i) who purchased diesel from Pilot in locations where Pilot had no direct competition and (ii) who also

would not likely be able to notice a change in their off-invoice discount, so that he and his coconspirators could deceptively reduce the off-invoice discount amounts for those customers without the customers' knowledge, which the defendant, ARNOLD RALENKOTTER, referred to as "jacking" the discount.

## Overt Act in Furtherance of the Conspiracy

15. In furtherance of the conspiracy, the following overt act, among others, was committed in the Eastern District of Tennessee: During March 2012, as an overt act in furtherance of the conspiracy to commit mail fraud and wire fraud by defrauding Pilot customers, the defendant, ARNOLD RALENKOTTER, knowingly and willfully, and with the intent to defraud, caused an interstate wire transmission to be sent, namely the e-mailing of a spreadsheet from Pilot's Knoxville, Tennessee headquarters to the defendant, ARNOLD RALLENKOTTER, who worked remotely in Hebron, Kentucky, that recommended the deceptive reduction of customer rebate amounts, and further caused a deceptively reduced rebate check for the month of February 2012 to be mailed from Pilot's Knoxville, Tennessee headquarters to Pilot's customer Dana Transport in New Jersey. In violation of Title 18, United States Code, Section 1349;

being advised of the nature of the charges and of his rights, hereby waives in open court prosecution by Indictment and consents that the proceeding may be by Information instead of by Indictment.

May 29, 2013
Date

Arnold Ralenkotter
Defendant

May 29, 2013
Date

Edward M. Yarbrough
Attorney for Defendant