IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION

------------------------------------------------------------

UNITED STATES OF AMERICA )
) No. 3:13-cr-063-1
   Plaintiff, )
) Knoxville, TN
v. ) May 29, 2013
) 11:00 a.m.
ARNOLD RALENKOTTER )
)
   Defendant. )

------------------------------------------------------------

PLEA TO INFORMATION
BEFORE THE HONORABLE AMUL R. THAPAR
UNITED STATES DISTRICT JUDGE

------------------------------------------------------------

Appearances:

For the Plaintiff:    F.M. HAMILTON, III, ESQ.
U.S. Department of Justice
Office of U.S. Attorney
800 Market Street, Suite 211
Knoxville, Tennessee 37902
865-545-4167
Email: Trey.hamilton@usdoj.gov

For the Defendant:    EDWARD M. YARBROUGH, ESQ.
Walker, Tipps & Malone PLC
150 Fourth Avenue North
2300 One Nashville Place
Nashville, Tennessee 37219
Email: Eyarbrough@walkertipps.com

Prepared By:
TIFFANY ASHTON, LCR# 625
MILLER & MILLER COURT REPORTERS
12804 Union Road, Knoxville, TN 37934
Phone: 865-675-1471 / Fax: 865-675-6398
E-mail: Jmccon3590@aol.com

Electronically signed by Tiffany Ashton (201-068-784-0938)    025f6c68-21d1-4c8b-9829-b7e41de87ae6

1          This cause came on for hearing on the 29th of May,

2     2013, in the United States District Court for the Eastern

3     District of Tennessee, Northern Division, the Honorable Judge

4     Amul R. Thapar presiding.

5          The Court having been duly opened, the following

6     proceedings were had, to-wit:

7          COURTROOM DEPUTY:  All rise.  This Court is now in

8     session.  The Honorable Amul R. Thapar, United States Eastern

9     District Judge presiding.  Please come to order and be seated.

10         THE COURT:  Please call the case.

11         COURTROOM DEPUTY:  Yes, Your Honor.  This is

12    criminal action 3:13-CR-063-1, United States of America versus

13    Arnold Ralenkotter.

14         Is the Government present and ready to proceed?

15         MR. HAMILTON:  We are, Your Honor.

16         COURTROOM DEPUTY:  Is the Defendant present and

17    ready to proceed?

18         MR. YARBROUGH:  The Defendant is present and ready,

19    Your Honor and I'm Edward Yarbrough of the Davidson County

20    Tennessee Bar, Your Honor.

21         THE COURT:  Good morning.  Good morning to everyone.

22    Mr. Yarbrough, can you and your client please approach the

23    podium?  Are you okay with that?

24         MR. YARBROUGH:  Yes, Your Honor.

25         THE COURT:  Can you please place the Defendant under

1    oath?

2              COURTROOM DEPUTY:  Yes, Your Honor.  Mr.

3    Ralenkotter, if you would, do you solemnly swear or affirm to

4    tell the truth, the whole truth, and nothing, but the truth,

5    so help you God?

6              MR. RALENKOTTER:  I do.

7                   (The witness was duly sworn.)

8              COURTROOM DEPUTY:  Please state your full name for

9    the record.

10             MR. RALENKOTTER:  Arnold Lee Ralenkotter.

11             THE COURT:  And, Mr. Ralenkotter, are you

12   represented in this proceeding by Mr. Yarbrough who is to your

13   right?

14             MR. RALENKOTTER:  Yes, Your Honor.

15             THE COURT:  Okay.  I want to make you a deal.  I'm

16   going to ask you a large number of questions and some of them

17   I may gargle, I may be confusing in some way.  Will you make

18   sure that, as I ask a question, that you understand them?  And

19   if you don't, can you stop me and tell me you don't understand

20   them so I can rephrase them?

21             MR. RALENKOTTER:  Yes, Your Honor.

22             THE COURT:  Okay.  Have you all executed a waiver of

23   indictment?

24             MR. YARBROUGH:  May it please the Court, we have a

25   form waiver of indictment in this case, which is ready to be

1    executed, but he has not yet signed it, but he is prepared to.

2            THE COURT:  Okay.  May I ask the United States --

3    I'm sorry.  Who's speaking for the United States?

4            MR. HAMILTON:  Your Honor, my name is Trey Hamilton.

5    I'm with the U.S. Attorney's Office here in Knoxville,

6    Tennessee.

7            THE COURT:  Okay.  Mr. Hamilton, good morning.  The

8    process is -- just so I understand, because I usually do the

9    waivers, you've gone through the whole -- he understands his

10    rights about the grand jury and everything else, he's waived

11    all those rights and I can sign the waiver of indictment and

12    proceed to the change of plea?

13            MR. HAMILTON:  That's covered in the waiver that he

14    is waiving his right to an indictment by way of grand jury.

15    That's also specifically addressed in the plea agreement and

16    -- but I believe that during this Rule 11 proceeding that

17    those rights would also be reviewed with him.  He's had his

18    initial appearance, but that's the extent to the proceedings.

19            THE COURT:  Did the Magistrate Judge go over the

20    waiver?

21            MR. HAMILTON:  No, Your Honor.

22            THE COURT:  Okay.  All right.  Before we get to the

23    plea, Mr. Ralenkotter, I want to talk to you about the waiver

24    for just a minute and I'm going to -- if I do it by memory,

25    I'll forget to tell you something, so I'm going to pull

Electronically signed by Tiffany Ashton (201-068-784-0938)

1    something up on my -- just give me one second and I will get

2    it up.

3             Now, Mr. Ralenkotter, as I pull this up, I'm going

4    to ask you some of the questions that I remember by memory,

5    which is first and foremost, you understand that the

6    Government has to -- if they want to return an indictment,

7    they have to present that to a grand jury.  Do you understand

8    that?

9             MR. RALENKOTTER:  Yes, Your Honor.

10            THE COURT:  And a grand jury is just a group of

11   citizens drawn from the general public.  In other words, a

12   group of your peers and ordinary citizens that would have to

13   hear the evidence and determine by a preponderance of the

14   evidence that you have, in fact, committed a crime that the

15   Government's alleging.  Do you understand that?

16            MR. RALENKOTTER:  Yes, Your Honor.

17            THE COURT:  And while the indictment is not evidence

18   of guilt, you do have a constitutional right for any felony

19   that it be presented to a grand jury and they pass judgment on

20   whether or not there's a preponderance of the evidence

21   supporting your guilt.  Do you understand that?

22            MR. RALENKOTTER:  Yes, Your Honor.

23            THE COURT:  Okay.  And, now, I'm going to pull up my

24   form to make sure --

25            MR. HAMILTON:  Your Honor --

```
 1              THE COURT:  Yes?

 2              MR. HAMILTON:  And, please, I apologize for

 3      interrupting the Court --

 4              THE COURT:  No.

 5              MR. HAMILTON:  -- but if I may make a suggestion to

 6      the Court that the grand jury need only find by probable cause

 7      that --

 8              THE COURT:  That's right.  See?  That's why I pull

 9      up my forms.  The U.S. is correct.  So they have to find by

10      probable cause, which they're all kind of nebulous concepts,

11      but the key about probable cause is it's less than beyond a

12      reasonable doubt, which a jury would have to find and we're

13      going to talk about in a little bit.  Do you understand that?

14              MR. RALENKOTTER:  Yes, Your Honor.

15              THE COURT:  Okay.  Great.  Let's see if I can find

16      this.  You understand that you have each and every one of

17      these rights and the grand jury would have to meet, hear

18      witnesses against you that the Government would present and

19      then make those determinations?

20              MR. RALENKOTTER:  Yes, Your Honor.

21              THE COURT:  And knowing all of this, you're willing

22      to waive your rights to a grand jury indicting you and proceed

23      by information?

24              MR. RALENKOTTER:  Yes, Your Honor.

25              THE COURT:  Okay.  Is there any other questions the
```

1    United States believes I need to ask before accepting the

2    waiver?

3           MR. HAMILTON:  No, Your Honor.  I believe that

4    there's a form that's been provided that he can sign in open

5    court if the Court wouldn't mind going through that as well,

6    which you may have intended to do --

7           THE COURT:  Yes.

8           MR. HAMILTON:  -- but with respect to the waiver of

9    the indictment and grand jury, no, Your Honor.

10          THE COURT:  Okay.  And Mr. Yarbrough, you agree

11   there's no other questions I need to ask --

12          MR. YARBROUGH:  Yes, Your Honor.  I have discussed

13   this at some length with my client and I believe he is fully

14   understanding of his rights to an indictment.

15          THE COURT:  Great.  Mr. Ralenkotter, in front of you

16   -- am I pronouncing your name correctly?

17          MR. RALENKOTTER:  Yes, sir.

18          THE COURT:  In front of you is a waiver of the

19   indictment.  By signing that, you're acknowledging you fully

20   understand your rights and are willing to give up those rights

21   and proceed by information?

22          MR. RALENKOTTER:  Yes, Your Honor.

23          THE COURT:  Okay.  You may go ahead and execute

24   that.

25          (The Defendant signed the Waiver of Indictment.)

1          THE COURT:  Do you have any questions, sir, about

2     that form or anything we've talked about so far?

3          MR. RALENKOTTER:  No, Your Honor.

4          THE COURT:  And you reviewed all the contents of

5     this waiver with your attorney?

6          MR. RALENKOTTER:  Yes, Your Honor.

7          THE COURT:  And I don't need to execute it.  Is that

8     correct?

9          MR. HAMILTON:  That's not our practice here.

10          THE COURT:  Okay.  Great.  So this can be filed in

11     the record in this case?

12          MR. HAMILTON:  Yes, Your Honor.  Okay.  Great.  Now,

13     I'm going to ask you a number of questions.  It's my

14     understanding that you've come here today with the intention

15     to plead guilty.  Is that correct?

16          MR. RALENKOTTER:  Yes, Your Honor.

17          THE COURT:  Okay.  Do you understand that you're now

18     under oath and if you give false answers to any of my

19     questions, you can be charged with perjury or making a false

20     statement?

21          MR. RALENKOTTER:  Yes, Your Honor.

22          THE COURT:  Have you discussed everything you

23     believe you need to with Mr. Yarbrough?

24          MR. RALENKOTTER:  Yes, Your Honor.

25          THE COURT:  Have you had an opportunity to review

1      the waiver of indictment you just signed?

2                  MR. RALENKOTTER:  Yes, Your Honor.

3                  THE COURT:  Okay.  And you've gone over all the

4      contents with him?

5                  MR. RALENKOTTER:  Yes, Your Honor.

6                  THE COURT:  And you've talked about any possible

7      defenses you may have to the charges the United States is

8      bringing with Mr. Yarbrough?

9                  MR. RALENKOTTER:  Yes, Your Honor.

10                 THE COURT:  And, in your mind, have you had all of

11     your questions answered before coming here today?

12                 MR. RALENKOTTER:  Yes, Your Honor.

13                 THE COURT:  Do you have any lingering questions

14     about the process, about the waiver of indictment, about

15     changing your plea, about any of that?

16                 MR. RALENKOTTER:  No, Your Honor.

17                 THE COURT:  So it's my understanding that in making

18     and having all of these discussions, it's your intention to

19     plead guilty, correct?

20                 MR. RALENKOTTER:  Yes, Your Honor.

21                 THE COURT:  In making that determination, did you

22     discuss the maximum possible penalty with your attorney?

23                 MR. RALENKOTTER:  We did.

24                 THE COURT:  Okay.  Sir, how old are you?

25                 MR. RALENKOTTER:  51.

1          THE COURT:  And why don't you tell me where you went

2     to school?

3          MR. RALENKOTTER:  College?

4          THE COURT:  Why don't you start with high school and

5     go all the way through.

6          MR. RALENKOTTER:  I grew up in a little town,

7     Erlanger, Kentucky.  I went to a small catholic high school.

8          THE COURT:  What --

9          MR. RALENKOTTER:  St. Henry.

10         THE COURT:  Okay.  I'm from that area, so I'm

11    familiar with it.

12         MR. RALENKOTTER:  I attended Northern Kentucky

13    University while working full-time.  I did not complete

14    Northern Kentucky University.  I took a job and went to work

15    before I completed school.

16         THE COURT:  Did you ever complete college?

17         MR. RALENKOTTER:  No, sir.

18         THE COURT:  Okay.  And where did you take a job?

19         MR. RALENKOTTER:  I actually moved to Nashville and

20    went to work for a company called Comp Data.

21         THE COURT:  Okay.  And how long did you work there?

22         MR. RALENKOTTER:  Eight years, eight or nine years.

23         THE COURT:  And then why don't you tell me where you

24    went from there?

25         MR. RALENKOTTER:  That was '86 to '94.  In '94, I

1    went up there and went to work with a truck stop chain called

2    Petro.  They were based out of El Paso, but I went to work for

3    them covering the northeast territory, worked there for three

4    years and then went to work at Pilot.

5            THE COURT:  And you've worked there ever since?

6            MR. RALENKOTTER:  Yes, sir.

7            THE COURT:  Okay.  Have you in your entire life been

8    treated for any mental illnesses?

9            MR. RALENKOTTER:  No, sir.

10           THE COURT:  Have you ever been addicted to narcotics

11   of any kind?

12           MR. RALENKOTTER:  No, sir.

13           THE COURT:  Have you taken any narcotic drugs,

14   tranquilizers, or hallucinogens in the past 24 hours?

15           MR. RALENKOTTER:  No, sir.

16           THE COURT:  Have you taken any medicine in the past

17   24 hours?

18           MR. RALENKOTTER:  I took a NyQuil tablet last night

19   to try to sleep.

20           THE COURT:  Okay.  And what time did you take the

21   NyQuil tablet?

22           MR. RALENKOTTER:  About 10:30.

23           THE COURT:  Okay.  And so in my experience with

24   NyQuil tablets, that wears off about six to eight hours later.

25   Is that your experience as well?

1           MR. RALENKOTTER:  I was up about 6:30.

2           THE COURT:  I'm sorry?

3           MR. RALENKOTTER:  I was up about 6:30 this morning.

4           THE COURT:  And you know how NyQuil can make you

5    drowsy, were you drowsy at all?

6           MR. RALENKOTTER:  Till I had my first cup of coffee.

7           THE COURT:  Okay.  You sound like me.  Are you

8    drowsy at all now?

9           MR. RALENKOTTER:  Maybe a little bit, sure.

10          THE COURT:  Okay.  And do you feel like you can

11   fully understand all of my questions in spite of that

12   drowsiness?

13          MR. RALENKOTTER:  Yes, sir.

14          THE COURT:  Have you taken any other pills of any

15   kind in the past 24 hours?

16          MR. RALENKOTTER:  No, sir.

17          THE COURT:  What about vitamins?

18          MR. RALENKOTTER:  No, sir.

19          THE COURT:  Okay.  What about alcoholic beverages?

20   Have you drank any in the past 24 hours?

21          MR. RALENKOTTER:  No, sir.

22          THE COURT:  Do you know why I'm asking you all these

23   questions?

24          MR. RALENKOTTER:  No, sir.

25          THE COURT:  I want to make sure that you -- remember

1    how I told you at the beginning I want you to understand my

2    questions?  If you're on drugs, you can tell me you understand

3    them, but you really won't.

4            Now, I can tell from looking at you and your

5    response that you understand everything I'm saying, but I just

6    want to make sure.

7            Mr. Yarbrough, do you have any question as to the

8    Defendant's competency to plead at this time?

9            MR. YARBROUGH:  No, I do not, Your Honor.

10           THE COURT:  Mr. Yarbrough, have you ever at any time

11   perceived a need for an evaluation of the Defendant or seen

12   any indication of erratic or irrational decision making on

13   behalf of the Defendant?

14           MR. YARBROUGH:  No, Your Honor.  I've seen no

15   indications of that.

16           THE COURT:  Okay.  Mr. Ralenkotter, do you

17   understand the charge against you in this case?

18           MR. RALENKOTTER:  Yes, sir.

19           THE COURT:  Are you satisfied with Mr. Yarbrough's

20   advice and representation?

21           MR. RALENKOTTER:  Yes, sir.

22           THE COURT:  I want to talk to you -- I know you went

23   over this with your attorney, but I want to talk to you for a

24   minute about the maximum penalties and how they work in this

25   case and if you have any questions, I want to talk to you

1    about that okay?

2              MR. RALENKOTTER:  Yes, sir.

3              THE COURT:  So it's my understanding you're here

4    today to plead to a count, one count of conspiracy to commit

5    mail fraud and wire fraud in violation of 18 United States

6    Code § 1349, right?

7              MR. RALENKOTTER:  Yes, sir.

8              THE COURT:  And you've gone over that section with

9    your attorney, correct?

10             MR. RALENKOTTER:  Yes, sir.

11             THE COURT:  And you understand it carries a maximum

12   penalty of 20 years imprisonment?

13             MR. RALENKOTTER:  Yes, sir.

14             THE COURT:  Do you understand it carries a fine of

15   not more than $250,000?

16             MR. RALENKOTTER:  Yes, sir.

17             THE COURT:  Do you understand that restitution in

18   this case may be mandatory and you will be liable for that

19   restitution?

20             MR. RALENKOTTER:  Yes, sir.

21             THE COURT:  Am I correct, Mr. Lewen, that

22   restitution may be mandatory?

23             MR. HAMILTON:  Your Honor, restitution is mandatory

24   in this case.

25             THE COURT:  Okay.  And have the victims been

1          notified of their rights?

2                    MR. HAMILTON:  Well, Your Honor, in this case,

3          because it's an ongoing investigation and because the

4          potential victims are still being identified in this ongoing

5          investigation, not all of the potential victims have been

6          notified because they're still being identified.

7                    Additionally, this proceeding was under seal until

8          just moments before, Judge, you stepped out here and as a

9          result, the one company who was identified as a potential

10         victim in the plea agreement has not been notified.

11                   But consistent with the law under 18 U.S.C. §

12         3171(c), the United States will make it's best efforts to

13         notify that victim shortly following this proceeding now that

14         this matter is not under seal.

15                   THE COURT:  Great.  And can I be assured as we go

16         forward that the United States will notify all victims as they

17         become -- as the United States becomes aware of them and

18         notify them of all hearings and relevant matters?

19                   MR. HAMILTON:  Yes, your Honor.  The United States

20         is well aware of its obligations with respect to victim

21         notification and as those victims are identified and confirmed

22         to be victims, we will certainly comply with our obligations

23         under the law.

24                   THE COURT:  Great.  Thank you very much.

25                   Do you also understand that you'll face a mandatory

1       special assessment of $100, which you will have to pay?

2              MR. RALENKOTTER:  Yes, sir.

3              THE COURT:  Finally, I want to talk to you for a

4       second about supervised release.  You will be placed on up to

5       three years of supervised release following any period of

6       incarceration.  Do you understand that?

7              MR. RALENKOTTER:  Yes, sir.

8              THE COURT:  And the conditions on supervision may be

9       stricter than society in general, so I'm going to give you an

10      example.  After -- when we get to sentencing, I may require

11      that you complete your college degree and I may only give you

12      two years to do so, all right?

13             So unlike everyone else in the world, if you don't

14      complete your college degree, can you tell me what would

15      happen to you?

16             MR. RALENKOTTER:  I would go to jail.

17             THE COURT:  You'd go back to jail.  So supervised

18      release can be a revolving door where if you don't comply with

19      the terms and conditions I set that will be stricter than

20      society, you could end up back in jail.  Do you understand

21      that?

22             MR. RALENKOTTER:  Yes, Your Honor.

23             THE COURT:  And then you will be placed on a new

24      period of supervised release.  Do you understand that?

25             MR. RALENKOTTER:  Yes, Your Honor.

1      THE COURT:  There's another thing about supervised

2   release that's different than everything else, whereas the

3   Government needs to prove your guilt beyond a reasonable doubt

4   to show a criminal violation, for supervised release, they

5   only need to prove a violation by a preponderance of the

6   evidence.  Do you understand that?

7      MR. RALENKOTTER:  Yes, Your Honor.

8      THE COURT:  So if I say you're not allowed to drink

9   alcohol during the term of your supervision, which is likely a

10  condition, and they can prove by a preponderance of the

11  evidence that you had one beer, do you know where you go?

12     MR. RALENKOTTER:  Back to jail, sir.

13     THE COURT:  Okay.  So you understand that.  Do you

14  have any questions about supervised release or anything we've

15  talked about so far?

16     MR. RALENKOTTER:  No, Your Honor.

17     THE COURT:  Now, we talked about how the maximum

18  term of imprisonment in this case is 20 years in prison.  Do

19  you understand that if the Court accepts your plea of guilty,

20  it can impose the maximum penalty of 20 years imprisonment in

21  this case?

22     MR. RALENKOTTER:  Yes, Your Honor.

23     THE COURT:  And three years of supervised release.

24  Do you understand that?

25     MR. RALENKOTTER:  Yes, Your Honor.

1          THE COURT:  Do you understand that if your plea of

2     guilty is accepted, the Court can impose the same penalty as

3     though you pled not guilty, stood trial, and were convicted by

4     a jury?

5          MR. RALENKOTTER:  Yes, Your Honor.

6          THE COURT:  Do you understand that the offences to

7     which you are pleading -- the offense to which you are

8     pleading guilty is a felony offense and that if your plea is

9     accepted, you will be judged guilty of that offense and such

10    adjudication may deprive you of valuable civil rights such as

11    the right to vote, the right to hold public office, the right

12    to serve on a jury, and the right to possess any kind of

13    firearm?

14         MR. RALENKOTTER:  Yes, Your Honor.

15         THE COURT:  Are you a citizen of the United States?

16         MR. RALENKOTTER:  Yes, Your Honor.

17         THE COURT:  Do you understand if you're not a

18    citizen of the United States or the Government later

19    determines that you are not, you could be subject to

20    deportation and most likely will as a result of pleading

21    guilty to this offense?

22         MR. RALENKOTTER:  Yes, Your Honor.

23         THE COURT:  Okay.  Don't worry.  If you are a

24    citizen, they can't take it away as long as you're a

25    natural-born citizen, at least I've not heard -- and Mr.

1      Yarbrough may know more than me, but I've never heard of the

2      United States being able to do that.

3              MR. YARBROUGH:  I'm with you, Judge.

4              THE COURT:  Okay.  Do you also understand that by

5      pleading guilty, you can lose significant things including

6      professional licenses, the right to a concealed carry permit

7      or other gun permits because you'll never be able to possess a

8      gun again, and you could also have difficulty finding jobs in

9      the like as a convicted felon?

10             MR. RALENKOTTER:  Yes, Your Honor.

11             THE COURT:  Do you have any questions about any of

12     that?

13             MR. RALENKOTTER:  No, Your Honor.

14             THE COURT:  Have you and Mr. Yarbrough gone over how

15     the sentencing guidelines might apply in your case?

16             MR. RALENKOTTER:  Yes, Your Honor.

17             THE COURT:  Do you understand that the sentencing

18     guidelines are just one tool the Court will use in determining

19     an appropriate sentence in your case?

20             MR. RALENKOTTER:  Yes, Your Honor.

21             THE COURT:  Mr. Lewen, this is not an 11(c)1(C) plea

22     agreement, correct?

23             MR. HAMILTON:  It is not, Your Honor.  And this is

24     Mr. Lewen.  I'm Mr. Hamilton, but --

25             THE COURT:  I am so sorry.

1    MR. HAMILTON:  -- I'm happy to be called Mr. Lewen.

2    It's totally -- but I just wanted to --

3    THE COURT:  Well, I'm glad you clarified that.

4    MR. HAMILTON:  Your Honor, it is not an 11(c)(1)(C)

5    plea agreement, but as the Court I'm sure has already seen in

6    paragraph 3, the United States has agreed to make a

7    recommendation pursuant to 11(c)(1)(B), which the Court is not

8    obligated to accept.  So this is not an 11(c)(1)(C).

9    THE COURT:  Do you understand all that, Mr.

10   Ralenkotter?

11   MR. RALENKOTTER:  I think so, Your Honor.

12   THE COURT:  Okay.  Let's talk about it for just a

13   second.  So what Mr. Hamilton said -- and I apologize again

14   for getting the names wrong, but -- and it won't happen again,

15   Mr. Hamilton, now that I've figured it out.

16   MR. HAMILTON:  I'm happy to be called Mr. Lewen any

17   time.

18   THE COURT:  Okay.  Good.  And I assume Mr. Lewen is

19   sitting to your right and my left?

20   MR. HAMILTON:  That's correct.

21   THE COURT:  Okay.  Good.  Mr. Ralenkotter, in the

22   plea agreement -- and we're going to go over the plea

23   agreement momentarily, the United States, in that discussion

24   we just had, an 11(c)(1)(C) plea agreement is binding on the

25   Court, whereas an 11(c)(1)(B) plea agreement is just a

1    recommendation to the Court.  Do you understand the

2    difference?

3            MR. RALENKOTTER:  Yes, sir.

4            THE COURT:  The sentencing guidelines, I want to

5    talk to you about for just a second, are a way of setting

6    boundaries, boundaries that are advisory for the Court in

7    determining what an appropriate sentence is.  Do you

8    understand that?

9            MR. RALENKOTTER:  Yes, Your Honor.

10           THE COURT:  But before the Court can determine an

11   appropriate sentence in your case, there will be a presentence

12   report prepared and the Court must consider that as well as

13   all other facts your attorney and the United States wants the

14   Court to consider and then the Court will look at what's

15   called 18 United States Code § 3553(a) factors to determine if

16   the guidelines are reasonable and sufficient, but not greater

17   than necessary in your case.  Do you understand that?

18           MR. RALENKOTTER:  Yes, Your Honor.

19           THE COURT:  Okay.  So I just gave you a mouthful and

20   you understand everything I said?

21           MR. RALENKOTTER:  Am I C or B?

22           THE COURT:  You are B, so there's no binding -- in

23   other words, what's going to happen just so we're on the same

24   page is you'll do whatever you and the Government have agreed

25   to do, you'll plead to this -- and then some day down the

1     road, usually 90 to 120 days, but the Government or Mr.

2     Yarbrough may push that off so that everyone is sentenced at

3     the same time so that your -- you get a fair sentence, these

4     will be all your codefendants.

5          Now, the Court doesn't have to consider that, but

6     it's something Courts ordinarily consider in determining what

7     a fair sentence is.

8          What happens is a presentence report is prepared and

9     your attorney and the United States -- and we're going to talk

10    about this -- are going to have the opportunity to object to

11    that and then the Court gets that, okay?

12         And, first, you have an opportunity to object with

13    probation and if they don't agree with you or the United

14    States, then it comes to me and we have a hearing on that,

15    then I determine what the guidelines are.

16         Now, just because I determine what the guidelines

17    are doesn't mean I have to sentence within the guidelines.  I

18    can vary upwards and I can vary downwards.  And I'll give you

19    a sentence that the statutory factors and the guidelines

20    determine is fair and just.

21         The difference is an 11(c)(1)(C) plea agreement, you

22    and United States agree to a specific sentence and I can

23    either accept the plea agreement or reject the plea agreement,

24    but I have no discretion as to sentence in that situation.  Do

25    you understand the difference?

1          MR. RALENKOTTER:  Yes, I do, Your Honor.  Thank you.

2          THE COURT:  Okay.  And your plea is 11(c)(1)(B) plea

3    agreement.  Do you understand?

4          MR. RALENKOTTER:  Yes, Your Honor.

5          THE COURT:  Okay.  Do you understand -- as I've just

6    talked about probably more than you wanted to hear, that I

7    won't be able to determine a fair and just sentence until

8    after I consider the presentence report?

9          MR. RALENKOTTER:  Yes, Your Honor.

10          THE COURT:  So if you ask me today what sentence you

11    are going to get, I would tell you it's somewhere between 0

12    and 20 years.

13          MR. RALENKOTTER:  Yes, Your Honor.

14          THE COURT:  Okay.  Do you understand the Court is

15    not bound by any stipulation of facts between you and the

16    Government, the Court will, with the aid of the presentence

17    report, determine what facts are relevant for sentencing?

18          MR. RALENKOTTER:  Yes, Your Honor.

19          THE COURT:  Now, I want to talk to you about a

20    specific provision in the plea agreement that I marked, but it

21    might take me a little time to find.  And, Mr. Hamilton, maybe

22    you can point me to it.  I think it's different than ours,

23    which is the waiver in -- the waiver of appeal and things like

24    that.

25          MR. HAMILTON:  Yes.  I believe that it's either

1    paragraph -- I think it's paragraph 13, Your Honor.

2              THE COURT:  So do you have the plea agreement in

3    front of you?

4              MR. RALENKOTTER:  Yes, Your Honor.

5              THE COURT:  Okay.  I want you to look at paragraph

6    13 and I want to talk about 13A first, okay?  So the -- you --

7    here, if you go past the first introductory point, which

8    points out the kind of deal you all cut, "the Defendant agrees

9    not to file a direct appeal of the Defendant's conviction or

10   sentence except that the Defendant retains the right to appeal

11   a sentence imposed above the sentencing guideline range or any

12   applicable mandatory minimum sentence, whichever is greater

13   determined by the District Court."

14             Now, it's my understanding, unless something's new,

15   Mr. Hamilton, there is no mandatory minimum in a 1349 crime,

16   correct?

17             MR. HAMILTON:  That is correct, Your Honor.

18             THE COURT:  Okay.  So you can ignore that part and

19   let's talk about this:  So let's say the guidelines in your

20   case -- and I'm just making this up, I have no idea -- are 18

21   to 24 months, okay?  If I sentence you to 21 months, can you

22   appeal the sentence?

23             MR. RALENKOTTER:  No, Your Honor.

24             THE COURT:  Okay.  What if I sentence you to 24

25   months and two days?  Can you appeal the sentence?

1              MR. RALENKOTTER:  Yes, Your Honor.

2              THE COURT:  Okay.  What if I sentence you to 12

3     months and one day?  Can you appeal the sentence?

4              MR. RALENKOTTER:  No, Your Honor.

5              THE COURT:  It's because you can only appeal the

6     sentence if it's greater than the sentencing guideline range.

7     And as we talked about before, I can sentence you above the

8     sentencing guideline range -- and you're nodding your head so

9     you understand that, correct?

10             MR. RALENKOTTER:  Yes, sir.

11             THE COURT:  In that instance, you can appeal, but in

12    all other instances, you can't.  Any questions?

13             MR. RALENKOTTER:  No, sir.

14             THE COURT:  Okay.  Let's go over paragraph B.  "In

15    addition, the Defendant knowingly and voluntarily waives the

16    right to file any motions or pleadings pursuant to 28 United

17    States Code § 2255 or to collaterally attack the Defendant's

18    conviction and/or resulting sentence."

19             Now, I want to talk to you about that before we talk

20    about the second sentence.  What this means -- essentially

21    what -- they've set a deal and their deal is you can't attack

22    any screw-ups I make after the fact, but you can attack if

23    your counsel was ineffective and that's -- I'm going to tell

24    you right now that's a very difficult burden to prove, or if

25    the prosecutor acted unethically, you can attack that after

1    the fact in what's called a habeas corpus petition.

2          But by this waiver, if I screw up somehow, you can't

3    appeal me if I sentence you and the guidelines are below and

4    you can't attack me after the fact and say, "Judge, you were a

5    nutcase and you screwed up," you can't do that.  Do you

6    understand that?

7          MR. RALENKOTTER:  Yes, Your Honor.

8          THE COURT:  The only thing you retain the right to

9    do, as the second sentence says, is attack your counsel for

10   being ineffective, which I mentioned is very difficult to

11   prove, or attack the prosecutor for misconduct.  Do you

12   understand that?

13         MR. RALENKOTTER:  Yes, Your Honor.

14         THE COURT:  Okay.  And that's also very difficult to

15   prove.  Do you have any questions about that?

16         MR. RALENKOTTER:  No, sir.

17         THE COURT:  Okay.  Now, Mr. Hamilton, I want to know

18   how many plea offers you made to Mr. Yarbrough or how many

19   different plea agreements occurred in this case -- or were

20   made.

21         MR. HAMILTON:  I'm sorry.  Could you help me

22   understand that question better?

23         THE COURT:  Yeah.  The Missouri case out of the

24   United States Supreme Court -- what I'd like to know is how

25   many -- let's talk about it.  So you and Mr. Yarbrough had

1    discussions about a plea in this case obviously.  You didn't

2    just show up today with a plea agreement and everyone signed

3    it.  And how many plea agreements did you mail, fax, send,

4    e-mail, any way, hand to Mr. Yarbrough?

5         MR. HAMILTON:  I think I understand, Your Honor.  Is

6    the point of this exercise to make sure that the Defendant is

7    fully informed of any offers that have been made from --

8         THE COURT:  That is correct.

9         MR. HAMILTON:  -- the Government and his counsel?

10        THE COURT:  That is correct.

11        MR. HAMILTON:  Yes.  I'm certainly aware of the

12   importance of that.  The United States submitted one plea

13   agreement to defense counsel in this process.

14        THE COURT:  Were any of the terms changed or did you

15   negotiate the terms before you -- as you know, for example, in

16   paragraph 13A, you all obviously -- unless that's just form

17   language in this district, did you discuss the language in

18   some portion?

19        MR. HAMILTON:  13A, our appellate waiver is a form

20   provision --

21        THE COURT:  Okay.

22        MR. HAMILTON:  -- and it's only changed actually

23   with internal approval within the office and there are

24   actually -- there was -- the United States Attorney's Office

25   put the plea agreement together.  We advised Mr. Yarbrough

1   that it was coming his way and that really was the extent of

2   it.

3          Of course we met with Mr. Yarbrough and went over it

4   and I'm sure that there were some discussions about it.  What

5   precisely those were, I certainly would be reluctant to state

6   with that level of detail, but --

7          THE COURT:  No, that's fine.  And, Mr. Yarbrough,

8   every time the United States communicated with you, did you

9   talk to Mr. Ralenkotter about the plea agreement itself?

10          MR. YARBROUGH:  Yes, I did, Your Honor.  Just to be

11   fully disclosing everything here, the first time some of these

12   terms were discussed, Mr. Ralenkotter was actually in the room

13   and heard those discussions take place between myself and the

14   attorneys for the Government.

15          And then there were later discussions before

16   actually in the written agreement, which we engaged in, and

17   then, finally, the written plea agreement, which I went over

18   with Mr. Ralenkotter in detail.

19          THE COURT:  Okay.  And, Mr. Ralenkotter, were you

20   privy to all plea negotiations?

21          MR. RALENKOTTER:  Yes, Your Honor.

22          THE COURT:  And you feel like you discussed with

23   your attorney every time the United States and him had a

24   discussion, you discussed it with him?

25          MR. RALENKOTTER:  Yes, Your Honor.

1          THE COURT:  And this is the only plea agreement you

2     ever saw, correct?

3          MR. RALENKOTTER:  Yes, Your Honor.

4          THE COURT:  And that was a result of the

5     negotiations between your counsel and the Government?

6          MR. RALENKOTTER:  Yes, Your Honor.

7          THE COURT:  All right.  Are you concerned in any way

8     that there's anything else out there about this plea agreement

9     to which you were not advised?

10          MR. RALENKOTTER:  No, sir.

11          THE COURT:  And, Mr. Yarbrough, is that accurate

12     that he was advised of all negotiations --

13          MR. YARBROUGH:  Yes, it is, Your Honor.

14          THE COURT:  Okay.  Do you understand that parole has

15     been abolished and if you are sentenced to prison, you will

16     not be released on parole?

17          MR. RALENKOTTER:  Yes, Your Honor.

18          THE COURT:  Do you understand that even if the Court

19     could place you on probation, it may or may not do so?

20          MR. RALENKOTTER:  Yes, Your Honor.

21          THE COURT:  I want to talk to you about your

22     constitutional rights.  Before I do so, I want to make sure

23     you don't have any questions about anything we've covered so

24     far.

25          MR. RALENKOTTER:  No, sir.

1          THE COURT:  Okay.  The Court reminds and advises you

2     that under the Constitution and laws of the United States, you

3     have the right to plead and persist in your plea of not

4     guilty, you have the right to be tried by a jury, have a

5     speedy and public trial, you would have the right to the

6     assistance of counsel, the right to confront and cross-examine

7     the witnesses who testify against you, and the right to refuse

8     to testify yourself, unless you voluntarily chose to do so in

9     your own defense, and if you decide not to testify that cannot

10    be held against you and the jury will be instructed they

11    cannot hold it against you.

12          In such trial you would be presumed innocent until

13    such time, if ever, as the Government established your guilt

14    by competent evidence beyond a reasonable doubt.

15          At such trial you would be entitled to the issuance

16    of subpoenas to compel the attendance of witnesses on your

17    behalf.  The Government would have to pay for the attendance

18    of witnesses.

19          Do you understand that if you plead guilty, you give

20    up all of the rights I have just mentioned?

21          MR. RALENKOTTER:  Yes, Your Honor.

22          THE COURT:  Do you understand that if you plead

23    guilty, there will not be a further trial of any kind in your

24    case, so that by pleading guilty, you're giving up the right

25    to a trial?

1          MR. RALENKOTTER:  Yes.

2          THE COURT:  If you plead guilty, do you understand

3     you will also have to waive your right not to incriminate

4     yourself since I will have to ask you questions about what you

5     did in order to satisfy myself that you are guilty as charged

6     and you will have to acknowledge your guilt?

7          MR. RALENKOTTER:  Yes, Your Honor.

8          THE COURT:  Are you willing to waive and give up

9     your right to a trial and the other rights I have just

10    discussed?

11         MR. RALENKOTTER:  Yes, Your Honor.

12         THE COURT:  Now, I understand through our

13    discussions that you have a plea agreement with the United

14    States.  What I'm going to do now is I'm going to have Mr.

15    Hamilton summarize -- and he's just going to briefly summarize

16    the essential terms of the plea agreement.

17         Now, this is what the United States views as

18    essential.  I want you to listen closely.  I want to make sure

19    A, that he accurately summarizes what he views is essential

20    and B, that you tell me if that's what you viewed as critical

21    in agreeing to this plea agreement, are there any terms he

22    left out either in summarizing or that weren't included in the

23    plea agreement that were critical to you pleading guilty.  Do

24    you understand that?

25         MR. RALENKOTTER:  Yes, sir.

1          THE COURT:  Do you have any questions about what I

2     just said?

3          MR. RALENKOTTER:  No, sir.

4          THE COURT:  Okay.  Mr. Hamilton, will you please

5     summarize briefly the essential terms of the plea agreement?

6          MR. HAMILTON:  Yes, Your Honor.  And before I do

7     that, may I ask a question of the Court, please?

8          THE COURT:  You absolutely may.

9          MR. HAMILTON:  During the Court's proceeding today,

10     I've been tracking Rule 11(b), which -- that the Court is

11     aware of the areas the Court needs to cover before accepting a

12     guilty plea, and I thought that since there were only two

13     items that were left, that maybe I could bring those to the

14     Court's attention.

15          THE COURT:  You may.

16          MR. HAMILTON:  -- and at this point before we get

17     into the plea agreement.  One is Rule 11 -- Rule 11(b) --

18     excuse me, Rule 11, yes, (b)1(j), which is a reference to any

19     applicable forfeiture and that was not addressed when the

20     Court was discussing maximum penalties.

21          THE COURT:  Correct.  I cover that after the plea

22     agreement once I see if you all agree to a forfeiture.

23          MR. HAMILTON:  Okay.  And I want to -- as the

24     Court's already seen, there are no forfeiture allegations --

25          THE COURT:  Right.

1          MR. HAMILTON:  -- actually in the charge.  And the

2     other one, of course, may be another one that the Court is

3     going to address and, again, I apologize for interrupting the

4     Court, but that there was an obligation impose a special

5     assessment.  And that may also be later, but I wanted to bring

6     it up.

7          THE COURT:  I think we talked about that, correct?

8          MR. YARBROUGH:  Yes, we did.

9          THE COURT:  Mr. Ralenkotter?

10          MR. RALENKOTTER:  Yes, sir.

11          MR. HAMILTON:  Well, then I apologize.

12          THE COURT:  That's all right.  And let me just go

13     over the forfeiture now since -- you mentioned there is no

14     forfeiture, correct?

15          MR. HAMILTON:  There's no forfeiture allegation.  Of

16     course, there's always a potential for a civil forfeiture

17     proceeding, but that it not be part of the criminal

18     proceeding.  There are standard forfeiture provisions in the

19     plea agreement, but as the Court saw, there are no forfeiture

20     allegations in the informations.

21          THE COURT:  Right.  And, Mr. Ralenkotter, you

22     understand all of that?

23          MR. RALENKOTTER:  Yes, Your Honor.

24          THE COURT:  Does your understanding then include

25     that you've not agreed to any forfeiture in this case,

1    correct?

2            MR. RALENKOTTER:  Yes, sir.

3            THE COURT:  You do understand, and as Mr. Hamilton

4    just pointed out, that there could be -- and I talk about this

5    in a minute, but we can go over it now, that there could be a

6    civil forfeiture in this case in which the United States later

7    pursues a forfeiture, your house, your cars, anything like

8    that; but it has to tie it to criminal proceeds.  Do you

9    understand that?

10           MR. RALENKOTTER:  Yes, Your Honor.

11           THE COURT:  Okay.  Mr. Hamilton, is there anything

12   else you'd like to --

13           MR. HAMILTON:  No, Your Honor.

14           THE COURT:  Okay.  Thank you.

15           MR. HAMILTON:  And in response to the Court's

16   question about the summary of the plea agreement, the United

17   States respectfully offers to the Court that the summary that

18   the Government is going to provide today regarding the terms

19   of the plea agreement is just that, a summary.  And we'd like

20   to state that for the record.

21           It should in no way be intended as a substitute for

22   or an addition to the actual terms set forth in the plea

23   agreement executed by all the parties and filed with the Court

24   on May 24th, 2013, and I believe is identified as Record No. 4

25   in the Court's docket system.

1           More specifically, the integration clause that's set

2     forth in paragraph 15 of that written plea agreement remains

3     in full force in effect, that nothing said during the

4     Government's summary today modifies the written plea agreement

5     in any way at all.

6           With that said, Your Honor, turning to paragraph one

7     of the plea agreement, in that paragraph the parties agreed

8     that the Defendant will waive indictment and plead to an

9     information.  That paragraph also sets forth the maximum

10    penalties.

11          But if I may Your Honor, I would also like to

12    restate my introductory remarks that the United States

13    maintains that every paragraph, sentence, word is relevant to

14    the proceedings.  There isn't one that we consider more

15    important than the other ones.  Every term in here has a place

16    and has been thought out by our office.

17          We use -- our office uses a plea agreement that is a

18    form plea agreement in all the cases and it has actually been

19    carefully thought out by senior management at our office.  So

20    I would just advise the Court of that generally, that we

21    consider all of the terms relevant.  That covers paragraph 1.

22          Turning to paragraph 2 of the plea agreement, in

23    that paragraph, the paragraph sets forth the elements of the

24    charged offense.  Would the Court like for me to review the

25    elements with the Defendant at this time?

1            THE COURT:  Actually, we'll do it after you go

2      through the plea agreement if that's okay, as well as the

3      facts.

4            MR. HAMILTON:  Yes, Your Honor.  Well, turning to

5      paragraph 3, of course that paragraph summarizes the factual

6      basis with the Court, which the Government -- obviously the

7      Court and the Government consider very relevant to this

8      proceeding.

9            Also, I wanted to bring to the Court's attention

10     that paragraph 3 not only summarizes the relevant facts, but

11     paragraph 3 subparagraphs r, s, t -- r, s, and t in particular

12     identify the agreement between the United States and the

13     Defendant with respect to our promise to limit certain

14     guideline -- to recommend to the Court that there be certain

15     guideline limitations in place pursuant to Rule 11(c)(1)(B),

16     which we have already addressed, but I wanted to bring to the

17     Court's attention that that's where those are.

18            Turning to paragraph 4 of the plea agreement,

19     turning to paragraph 4, that paragraph states that the

20     Defendant acknowledges and understands the various rights that

21     he is giving up by pleading guilty.  And having compared that

22     provision with what the Court has reviewed today, it looks

23     like those items have not only been addressed in the plea

24     agreement, but also have been addressed in open court today as

25     well.

1          Turning to paragraph 5, that paragraph outlines the

2     possible disposition of this case, which is, of course, also

3     important.

4          And turning to paragraph 6, 7, and 8 of the plea

5     agreement, those paragraphs outline the terms surrounding the

6     Defendant's agreement to cooperate with any and all law

7     enforcement agents and personnel of the United States

8     Attorney's Office and outlines the parameters for that

9     cooperation.

10          Turning to paragraph 9, paragraph 9 addresses

11     acceptance of responsibility and the United States sentencing

12     guideline Section 3E1.1(b), which relates to the additional

13     point.

14          Turning to paragraph 10, that paragraph addresses

15     payment of a special assessment.  Paragraph 11 addresses the

16     payment of restitution in this case, which the Court has

17     touched upon already.  Paragraph 12 addresses any financial

18     obligation that the Defendant may have that arises from this

19     case.

20          Paragraph 13 addresses the appellate waiver, which

21     the Court has addressed already today.  Photograph 14 deals

22     with some contractual provisions related to the plea

23     agreement, more particularly, the binding date of the

24     agreement and the consequences of breach by any party to the

25     plea agreement.

1          Paragraph 15 is an integration clause that requires

2      that any modification to the agreement be reduced to writing

3      and fully -- and, of course, quite unequivocally states that

4      all the promises and undertakings and understandings between

5      the Defendant and the United States are set forth in this plea

6      agreement.

7          THE COURT:  Great.  Mr. Ralenkotter, did you hear

8      Mr. Hamilton's summary of the plea agreement?

9          MR. RALENKOTTER:  Yes, your Honor.

10         THE COURT:  And he summarized briefly, as he

11     mentioned, the essential terms of the plea agreement.  Did you

12     hear that?

13         MR. RALENKOTTER:  Yes, Your Honor.

14         THE COURT:  Were there any terms he left out that

15     were critical to your decision to plead guilty?

16         MR. RALENKOTTER:  No, Your Honor.

17         THE COURT:  Okay.  One of the terms that seems to me

18     -- and I know Mr. Yarbrough would say is critical -- is if you

19     look at -- and he summarized this, so your answer was correct,

20     was -- if you look at 3(r) -- and I just want to talk to you

21     about that provision for a second.

22          So there's two different ways the Government can

23     hold you accountable for conduct.  Under the sentencing

24     guidelines if you are held liable for the entire conspiracy,

25     the amount of loss would be significantly higher -- and I'm

1    just guessing.  I mean unless you were involved in every piece

2    of this, the guidelines would be higher and you would be

3    subject to a higher guideline range.  Do you understand that?

4              MR. RALENKOTTER:  We spoke about that, yes, sir.

5              THE COURT:  Okay.  So this, to me, is a critical

6    component for you to plead guilty.  But there's one thing I

7    want to talk to you about and that is that while that is true

8    under the sentencing guidelines, you realize that under

9    3553(a), I will consider the entire offense and what you are

10   personally responsible for.  And it will be still limited in

11   some fashion and things you don't know about, I can tell you

12   because I'm the sentencing judge, I'm not going to consider,

13   but I will consider the entire offense before determining if

14   the guidelines are appropriate.  Do you understand?

15             MR. RALENKOTTER:  Yes, Your Honor.

16             THE COURT:  So while this paragraph is critical to

17   you and I understand why, you understand the Court can

18   consider more than that.  The Court's not bound by this

19   limitation.

20             MR. RALENKOTTER:  Yes, Your Honor.

21             THE COURT:  Okay.  Now, is there anything that Mr.

22   Hamilton left out that was critical to your decision to plead

23   guilty?

24             MR. RALENKOTTER:  No, Your Honor.

25             THE COURT:  Okay.  Mr. Yarbrough, did he give a fair

1      and accurate summary of the plea agreement?

2               MR. YARBROUGH:  Yes, I believe so, Your Honor.

3               THE COURT:  Was there anything in your mind he left

4      out that was critical to the Defendant's decision to plead

5      guilty?

6               MR. YARBROUGH:  Nothing that I can think of, Your

7      Honor.

8               THE COURT:  Has anyone made any other or different

9      promises in this case that induced you to plead guilty?

10              MR. RALENKOTTER:  No, Your Honor.

11              THE COURT:  Aside from this plea agreement, has any

12     person, including an officer or agent of the Government or any

13     of the lawyers in this case promised or even suggested that

14     you will receive a lighter sentence or any other form of

15     leniency if you plead guilty?

16              MR. RALENKOTTER:  No, Your Honor.

17              THE COURT:  So you understand that by pleading

18     guilty, you can cut all the deals you want, but I can still

19     sentence you to the maximum sentence in this case?

20              MR. RALENKOTTER:  Yes, Your Honor.

21              THE COURT:  Is your decision to plead guilty your

22     own free and voluntary act?

23              MR. RALENKOTTER:  Yes, Your Honor.

24              THE COURT:  Have you been subjected to any threats

25     or force of any kind which caused you to plead guilty?

1          MR. RALENKOTTER:  No, Your Honor.

2          THE COURT:  Okay.  Now, we discussed this before --

3     there's no forfeiture provisions in this plea agreement.  Do

4     you understand?

5          MR. RALENKOTTER:  Yes, sir.

6          THE COURT:  And you also understand you can still be

7     subject to civil forfeiture?

8          MR. RALENKOTTER:  Yes, sir.

9          THE COURT:  You also understand that restitution is

10    mandatory?

11         MR. RALENKOTTER:  Yes, sir.

12         THE COURT:  Okay.  Great.  Mr. Hamilton, I would

13    like you to summarize what the Government would have to prove

14    beyond a reasonable doubt, in other words the essential

15    elements of this case, if this case went to trial.  And I want

16    you to listen closely because I'm going to ask you if you

17    understand what the Government would have to prove beyond a

18    reasonable doubt.

19         Then I'm going to have Mr. Hamilton summarize the

20    facts underlying it, and the facts are pretty extensive in

21    this plea agreement as you know.  I'm just going to have him

22    give a brief summary of the facts underlying the essential

23    elements, even though you signed and agreed to every fact in

24    this plea agreement.

25         And then I'm going to ask you a couple questions

1    about that and then I'm going to ask you a question about the

2    entire facts listed in the plea agreement.  Do you understand

3    that?

4         MR. RALENKOTTER:  Yes, sir.

5         THE COURT:  Okay.  Go ahead, Mr. Hamilton.

6         MR. HAMILTON:  All right.  Your Honor, in order to

7    -- in order for this Defendant to be convicted, the United

8    States at trial would have to prove beyond a reasonable doubt

9    that there existed an agreement between two or more persons to

10   commit mail fraud, an offense against the United States, that

11   is, with the intent to defraud, to knowingly devise and intend

12   to devise and to participate in a scheme and artifice to

13   defraud, and to obtain money by means of materially false and

14   fraudulent pretenses, representations, and omissions, and for

15   the purpose of executing such scheme and artifice, knowingly

16   causes any matter or thing to be sent and delivered by mail or

17   commercial interstate carrier, in violation of 18 U.S.C. §

18   1341; and wire fraud, an offense against the United States,

19   that is, with the intent to defraud, to knowingly devise and

20   intend to devise and to participate in the scheme and artifice

21   to defraud, and to obtain money by means of materially false

22   and fraudulent pretenses, representations, and omissions, and

23   for the purpose of executing such scheme and artifice to cause

24   to be transmitted by means of wire in interstate commerce,

25   writings, signs, and signals, in violation of 18 U.S.C. §

1        1343.

2                That the Defendant knowingly and voluntarily joined

3        and participated in the conspiracy; and that an overt act was

4        committed by at least one co-conspirator in furtherance of the

5        conspiracy.

6                THE COURT:  Thank you.  Now, all that is listed in

7        paragraph 2(a) of your plea agreement.  You remember that?

8                MR. RALENKOTTER:  Yes, sir.

9                THE COURT:  Do you understand the Government would

10       have to prove that entire mouthful beyond a reasonable doubt

11       at trial?

12               MR. RALENKOTTER:  Yes, sir.

13               THE COURT:  Okay.  Now, I'm going to summarize it in

14       a different way, but I'm going to tell you that what Mr.

15       Hamilton said is 100 percent accurate.

16               What I'm going to say is just for the simple minds

17       like mine, the way that I think of it, which is you had to

18       participate in a conspiracy to commit fraud and during that

19       conspiracy, you had to use the mail and/or wire, which is a

20       fax, e-mail.

21               The wire would have to cross interstate lines.  The

22       mail, if it's the United States Postal Service and other

23       things -- it has to be a commercial interstate carrier, so it

24       can be UPS or FedEx or someone like that, or it can be the

25       United States mail.  You would have to send things, you would

1    have to wire things all in furtherance of that conspiracy.  Do

2    you understand?

3                MR. RALENKOTTER:  Yes, Your Honor.

4                THE COURT:  Okay.  Is there any -- do you have any

5    questions about any of that?

6                MR. RALENKOTTER:  No, sir.

7                THE COURT:  Okay.  Now, I'm going to have Mr.

8    Hamilton -- again, he's just going to briefly summarize the

9    facts underlying those essential elements, so what the

10   Government would prove at trial.  But it's just a brief

11   summary.

12               I recognize this plea agreement contains extensive

13   facts that you've already agreed to and I'm going to ask you

14   about that as well.  Go ahead.

15               MR. HAMILTON:  And, Your Honor, I -- certainly I

16   understand.  I hear the Court when the Court is telegraphing

17   to me that the Court would like for this to be brief, but with

18   a case like this, we're reluctant to -- I'm reluctant to

19   provide that kind of brief summary, but I feel like with the

20   disclaimer that I provided at the beginning that any sort of

21   summary that I provide is not in any way intended to modify

22   the plea agreement, that we are safe to do that.

23               Generally, the factual basis in -- and I think that

24   it might be easiest just to highlight some of these

25   subparagraphs if --

1            THE COURT:  Yeah.  I mean if you want to go through

2      and read it, you're perfectly welcome if you feel more

3      comfortable that way.  I can assure you -- and I'm sure Mr.

4      Yarbrough doesn't object, nor does Mr. Ralenkotter, that -- I

5      mean I know Mr. Yarbrough went over this factual basis

6      extensively and I'm going to ask that with Mr. Ralenkotter,

7      but if you want to read the entire thing, I won't be offended,

8      so --

9            MR. HAMILTON:  No, Your Honor.  Typically -- and, of

10     course, this is my first proceeding before this Court.

11     Typically in these, in white collar matters, which I typically

12     handle, with a sophisticated Defendant like Mr. Ralenkotter,

13     if I may, what I ask the Court to do -- and you may already be

14     planning to do this -- is I ask the Court to inquire of the

15     Defendant if he has, in fact, read and reviewed paragraph 3,

16     which is on pages 4 through --

17            THE COURT:  I think it's 7 or 8.

18            MR. HAMILTON:  I believe it goes all the way through

19     paragraph -- it goes from paragraph 3, pages 4 through 11, did

20     he read every bit of that and by placing his signature --

21            THE COURT:  Pages 4 through 11?  Do I have a

22     different plea agreement?  I have it on 2 through 9.

23            MR. HAMILTON:  That's correct, Your Honor.  Excuse

24     me, that is correct.

25            THE COURT:  Oh, okay.  Maybe I heard you wrong.  Go

1    ahead.

2          MR. HAMILTON:  You did hear me incorrectly -- I'm

3    sorry.  You did hear me correctly.  I just misspoke.

4          THE COURT:  Okay.

5          MR. HAMILTON:  So that he read all of paragraph 3

6    and that he agrees with it all and by placing his signature at

7    the end of the document, he not only manifests assent to the

8    entire plea agreement, but, of course, the factual basis in

9    particular.  Would the Court consider doing that?

10         THE COURT:  Absolutely.  Mr. Hamilton, let me just

11   do that at the outset, but I still want you to summarize the

12   facts.

13         MR. HAMILTON:  I will, Your Honor.

14         THE COURT:  Okay.  Mr. Ralenkotter, you reviewed

15   this plea agreement, correct?

16         MR. RALENKOTTER:  Yes, Your Honor.

17         THE COURT:  You went through every paragraph in

18   paragraph -- in 3 in particular, paragraph 3(a) through (u)?

19         MR. RALENKOTTER:  Yes, Your Honor.

20         THE COURT:  And you discussed them extensively with

21   Mr. Yarbrough before agreeing to sign this document?

22         MR. RALENKOTTER:  Yes, Your Honor.

23         THE COURT:  And you agree to every fact therein or

24   you wouldn't have signed this document, correct?

25         MR. RALENKOTTER:  Yes, Your Honor.

1          THE COURT:  Okay.  You may proceed with a summary.

2          MR. HAMILTON:  All right.  Thank you, Your Honor.

3          Paragraph 3(a) provides the summary information

4     about the company, Pilot Corporation, and about its direct

5     sales division, which consists of regional vice presidents,

6     sales directors, and sales managers, and account

7     representatives, and that they are responsible for negotiating

8     various incentives, including price discounts for the

9     customers.

10          In paragraph (b), paragraph 3(b) in summary

11     identifies who the Defendant is and his place in the company

12     and that since 2008, he served as a regional sales director in

13     Pilot's direct sales division.  There are other relevant

14     provisions in that, but in the summary, I will skip over

15     those.

16          Paragraph 3(c) states that -- provides an

17     explanation about the way in which, in many instances, Pilot's

18     diesel discount deals are determined and it provides the

19     various ways that that happens.

20          Paragraph 3(d) also relates to the way in which

21     Pilot's discount deals are negotiated with customers and the

22     way in which those are implemented.  And paragraph (e)

23     identifies the difficulties for Pilot customers in following

24     what their diesel discount deals are because of the way it's

25     priced and the way that those prices are determined.

1              Paragraph 3(f) states that from approximately 2008

2      through approximately April 2013, the Defendant agreed and

3      conspired with other Pilot employees to deceptively withhold

4      discounts from Pilot customers, first through the deceptive

5      reduction of monthly rebate amounts, and ultimately by

6      deceptively lowering the off-invoice of customers who are

7      unlikely to catch off-invoice discount reduction and who

8      purchased fuel at Pilot travel plazas where Pilot had limited

9      competition.

10             Paragraph 3(g) states that from approximately 2008

11     through approximately April 2013 that the Defendant

12     deceptively withheld rebate amounts from Pilot customers in

13     the following manner:  That each month, the Defendant's inside

14     regional account representative who worked at Pilot

15     headquarters in Knoxville and was therefore referred to as an

16     inside regional account rep, sent a spreadsheet by way of

17     interstate wire transmission, namely an e-mail to the

18     Defendant who worked remotely in Hebron, Kentucky, that

19     identified the actual rebate amounts that the Defendant

20     Ralenkotter's customers should receive pursuant to their

21     discount agreements and recommended amounts by which to

22     deceptively reduce the targeted customers' rebates without

23     telling the affected customers.

24             The Defendant would then approve or sometimes

25     further reduce his inside regional account representative's

1    recommended rebate reductions.

2            After the Defendant approved the amounts of the

3    fraudulent rebate reductions, the defendant's inside regional

4    sales representative would cause rebate checks in the

5    deceptively reduced amounts to be mailed or sent by a

6    commercial carrier to the targeted customers.

7            On one occasion between 2008 and 2013, the Defendant

8    told a subordinate that if he was not willing to deceptively

9    reduce the customer's rebate, then the Defendant would take

10   the customer's account from him.

11           On October 25th, 2012, during a business meeting of

12   Pilot sales directors, Defendant Ralenkotter expressed in the

13   presence of other sales directors his mutual agreement to

14   defraud certain Pilot customers by deceptively withholding the

15   full amount of the agreed-upon rebate amount to some customers

16   when the actual rebate that Pilot owed the customer for a

17   current month substantially exceeded the rebate Pilot paid the

18   customer for the immediately preceding month.

19           On October 25th, 2012, Defendant Ralenkotter also

20   expressed his intent to defraud Pilot customers by bragging to

21   other Pilot direct sales employees that for the purpose of

22   preventing a Pilot customer from taking its business to

23   another customer, he lied to that customer and told that

24   customer that Pilot would give that customer a better discount

25   deal than the customer had previously been receiving, well

1    knowing that he, the Defendant, had no intention of actually

2    giving that discount to the customer and, in fact, did not

3    give that promised discount to the customer.

4         During the same October 25, 2012 business meeting of

5    Pilot sales directors, it was agreed among those present that

6    Pilot's national accounts sales director would teach Pilot's

7    sales managers and account representatives manual rebate

8    practices during Pilot's annual sales training event at Pilot

9    headquarters planned for November 2012.

10        Then on November 19 and 20, 2012, Pilot held a

11   mandatory sales training meeting for the company's diesel

12   direct sales division of its headquarters located at 5508

13   Lonas Drive, Knoxville, Tennessee.

14        During this training meeting, Defendant Ralenkotter

15   attended a break-out teaching session in which Pilot's

16   national accounts sales director, in furtherance of the

17   conspiracy to commit mail and wire fraud, encouraged and

18   taught Pilot direct sales personnel how to defraud without

19   detection, some of Pilots customers who choose to receive

20   their discount in the form of a rebate check.  This Pilot

21   sales director who gave this instruction encouraged the use of

22   a spreadsheet in the manner similar to the process described

23   above in paragraph 3(g).

24        By February 2013, the conspiracy to commit mail and

25   wire fraud in which the Defendant Ralenkotter and other Pilot

1    employees were participating had evolved to the point that

2    Defendant Ralenkotter was working with other Pilot employees

3    toward identifying customers one, who purchased diesel from

4    Pilot in locations where Pilot had no direct competition, and

5    two, who also would not likely be able to notice a change in

6    their off-invoice discount, so that he and his co-conspirators

7    could deceptively reduce the off-invoice discount amounts for

8    those customers without the customers' knowledge, which

9    Defendant Ralenkotter referred to as "jacking" the discount

10   during a February 22, 2013 conversation that the Defendant

11   Ralenkotter had with another Pilot direct sales employee.

12          From 2008 through April of 2013, the Defendant, in

13   violation of 18 U.S.C. § 1349, conspired and agreed with other

14   Pilot employees to commit mail fraud, an offense against the

15   United States in violation of 18 U.S.C. § 1341, and wire

16   fraud, an offense against the United States in violation of 18

17   U.S.C. § 1343.  And the elements, again, which we have gone

18   over today are restated here in substance as well.

19          It further states that the Defendant caused to be

20   transmitted by means of wire and interstate commerce,

21   writings, signs, and signals, so that Pilot could fraudulently

22   retain rebates and discounts that were owed and due to Pilot

23   customers, so that Pilot could create and maintain the

24   materially false pretense that those customers were, in fact,

25   receiving their agreed upon diesel price discount with Pilot

1    for the purpose of inducing those customers to continue with

2    their purchasing of diesel fuel from Pilot, rather than a

3    competitor and for the purpose of increasing both Pilot's

4    profits and its sales personnel's commissions.

5         Defendant Ralenkotter and co-conspirator Pilot

6    employees caused fraudulently determined rebate check amounts

7    and invoices to be sent to many of Pilot's customers, so that

8    Pilot could fraudulently retain those rebates that were owed

9    and discounts that were due to customers, so that Pilot could

10   create and maintain the false pretense that those customers

11   where, in fact, receiving their agreed upon price discount

12   with Pilot, for the purpose of inducing those customers to

13   continue their purchasing of diesel from Pilot, rather than a

14   competitor.

15        Paragraph -- that brings us to paragraph 3(p), which

16   states an additional reason for the scheme, which has already

17   been summarized.

18        Paragraph 3(q), during March 2012, as an overt act

19   in furtherance of the conspiracy to commit mail fraud and wire

20   fraud by defrauding Pilot customers, Defendant Ralenkotter

21   knowingly and willfully, and with the intent to defraud,

22   caused an interstate wire transmission to be sent, namely the

23   e-mailing of a spreadsheet from Pilot's Knoxville, Tennessee

24   headquarters to Defendant Ralenkotter, who worked remotely in

25   Hebron, Kentucky, that recommended the deceptive reduction of

1    customer rebates, and further caused a deceptively reduced

2    rebate check for the month of February 2012 to be mailed from

3    Pilot's Knoxville, Tennessee headquarters to Pilot's customer

4    Dana Transport in New Jersey.

5          The remainder of -- well, paragraph 3(r), 3(s), and

6    3(t); both the Government and the Court has addressed that the

7    Defendant, relating to the 11(c)(1)(B) aspect of this plea

8    agreement.

9          And, finally, the Government would note that in

10    reaching this agreement, the United States has acknowledged in

11    this plea agreement that Defendant Ralenkotter is the first

12    Pilot sales director to admit and accept criminal

13    responsibility for conspiring with others, including Pilot's

14    direct sales division employees to defraud Pilot customers by

15    fraudulently reducing Pilot customer rebates and discounts.

16          The Government appreciates the Court's patience with

17    the Government in reviewing that.  I tried to summarize the

18    initial introduction, but due to the nature of this case, I

19    felt like more of a verbatim reading of some more substantive

20    aspects was necessary.

21          THE COURT:  That's perfectly fine.  So, Mr.

22    Ralenkotter, between 2008 and 2013, you did conspire with

23    others, including employees of Pilot, to defraud some of the

24    customers as to the amount of their rebates.  Is that

25    accurate?

1           MR. RALENKOTTER:  Yes, Your Honor.

2           THE COURT:  And in doing so, you -- and Mr. Hamilton

3    went over some specific instances, I'm just going to cover it

4    generally -- you used the mails and wires to accomplish that

5    scheme to defraud.  Is that fair?

6           MR. RALENKOTTER:  Yes, Your Honor.

7           THE COURT:  And this occurred in the Eastern

8    District of Tennessee, which is in Knoxville and other places,

9    as well as apparently in the Eastern District of Kentucky,

10   which includes Hebron, Kentucky.  Is that accurate?

11          MR. RALENKOTTER:  Yes, sir.

12          THE COURT:  And you did all that voluntarily,

13   knowingly, and intelligently, correct?

14          MR. RALENKOTTER:  Yes, Your Honor.

15          THE COURT:  Is there anything I said in summarizing

16   Mr. Hamilton that's inaccurate?

17          MR. RALENKOTTER:  No, sir.

18          THE COURT:  Is there anything Mr. Hamilton said in

19   summarizing the terms -- the facts listed in the plea

20   agreement that's inaccurate?

21          MR. RALENKOTTER:  No, Your Honor.

22          THE COURT:  Are there any facts included in the plea

23   agreement itself to which you signed that are inaccurate?

24          MR. RALENKOTTER:  No, Your Honor.

25          THE COURT:  In light of everything I've told you

1    about your rights and in light of all of my questions, how do

2    you plead to Count 1 of the information?  Guilty or not

3    guilty?

4              MR. RALENKOTTER:  Guilty, Your Honor.

5              THE COURT:  The Court has observed the appearance

6    and responsiveness of the Defendant in giving his answers to

7    the questions asked.  Based on such observation of the answers

8    given, the Court is satisfied that Mr. Ralenkotter is in full

9    possession of his faculties.  He's not suffering from any

10   apparent physical or mental illness.  He's not under the

11   influence of narcotics or alcohol of any kind.

12             While he took a NyQuil last night, the Court has

13   observed him and he's completely responsive and understands

14   the proceedings in which he is engaged.  He understands the

15   nature and meaning of the charges and the consequences of his

16   plea of guilty.  He's aware of all plea negotiations

17   undertaken in his behalf.

18             The Court finds the Defendant is fully competent and

19   capable of entering an informed plea and that his plea of

20   guilty is a knowing and voluntary plea supported by an

21   independent basis in facts containing each of the essential

22   elements of the offense.  His plea of guilty is therefore

23   accepted.

24             Do I sign the original plea agreement in this

25   district?

1          MR. HAMILTON:  That's typically not our practice,

2     but it does -- it actually brings me to a point that if I may

3     ask the Court a question --

4          THE COURT:  Yes.

5          MR. HAMILTON:  -- that the original plea agreement

6     is right there with the clerk of Court and I was -- I would

7     request, when it's convenient for the Court, that plea

8     agreement be passed to the Defendant so that he could

9     acknowledge on the record that that's his original signature.

10          THE COURT:  Absolutely.

11          MR. HAMILTON:  May I approach, Your Honor, and

12     obtain that --

13          THE COURT:  Yeah.  I don't have it, so that would be

14     great.

15          MR. HAMILTON:  May I approach the lectern, Your

16     Honor?

17          THE COURT:  You may.  Is the plea agreement under

18     seal?

19          MR. HAMILTON:  Your Honor, that was the next thing I

20     was going to do was to move to unseal the plea agreement at

21     this time.

22          THE COURT:  That is granted.  Would you acknowledge

23     that that's your signature and then, Mr. Ralenkotter, would

24     you also initial by paragraph 3, along with your attorney,

25     acknowledging that those are the facts that we're talking

1     about throughout this proceeding?

2               (The Defendant complied.)

3               MR. HAMILTON:  And, Your Honor, if I could just

4     state for the record that this plea agreement was filed under

5     seal on May 24th, 2013, and it is record No. 4 and --

6               COURTROOM DEPUTY:  That's the proposed.  It's

7     actually Document No. 8.

8               MR. HAMILTON:  I'm sorry, Document No. 8.

9               COURTROOM DEPUTY:  I apologize.

10              MR. HAMILTON:  It's now Document No. 8.

11              THE COURT:  Okay.

12              MR. HAMILTON:  Well, then I need to, if I may then,

13    when I began my summary, I referenced this -- and on this

14    document, it actually has 4.  That was the proposed number at

15    the bottom of it.

16            So apparently it's now Document No. 8, so earlier in

17    this proceeding before I began the summary, I referenced it as

18    Document No. 4.  I need to correct that it's Document No. 8.

19              THE COURT:  Okay.

20              MR. HAMILTON:  And I just want to bring to the

21    Court's attention that what the Defendant just reviewed and

22    what he initialled is a document of the Court at this point

23    and it was brought to court by the Court by the clerk's office

24    to have in this proceeding, and so we're now going to return

25    it back to the Court.

1          THE COURT:  Great.  Now, will you initial paragraph

2    No. 3 as well?

3          MR. HAMILTON:  The United -- on behalf of the United

4    States?

5          THE COURT:  Yes, acknowledging that those are the

6    facts that we're all talking about.

7                (The United States complied.)

8          THE COURT:  Great.  That will be filed in the record

9    and it will be -- it will not be under seal at this point.

10   And you don't need me to sign it, correct?

11         MR. HAMILTON:  No, sir.

12         THE COURT:  Okay.  But it is approved and accepted

13   by the Court.

14         Can I ask how the bond has already been set?  And I

15   just want to mention to you, Mr. Ralenkotter, you will be on

16   your own recognizance.  Obviously, as you know, you can't

17   commit another federal, state, or local crime or any of the

18   other conditions that you'll sign and acknowledge to.

19         If you were to violate those conditions, you will

20   await sentencing in jail.  Are we on the same page?

21         MR. RALENKOTTER:  Yes, Your Honor.

22         THE COURT:  Okay.  As to the presentence report,

23   would the United States or Mr. Yarbrough like it prepared now

24   and a sentencing date set or would you prefer that I set a

25   status conference a few months out and then we can discuss an

1    appropriate sentencing date?

2              MR. HAMILTON:  May we have a moment, Your Honor?

3              THE COURT:  Yes.  You absolutely may.

4              MR. HAMILTON:  Your Honor, the Government and, I

5    believe, defense counsel would propose scheduling a status

6    conference in 120 days.

7              MR. YARBROUGH:  That's correct, Your Honor.

8              THE COURT:  Okay.  So your math will be better than

9    mine.  When are we -- so you're talking about September?

10             MR. HAMILTON:  Yes, Your Honor.

11             THE COURT:  Okay.

12             MR. YARBROUGH:  Right at the end of September, Your

13   Honor.

14             THE COURT:  All right.  How about September 24th?

15             MR. YARBROUGH:  That's clear for us, Your Honor.

16             MR. HAMILTON:  That's fine for the Government, Your

17   Honor.

18             THE COURT:  Okay.  We'll set it at 1:30 on September

19   24th.

20             MR. YARBROUGH:  Would that be here in Knoxville,

21   Your Honor, or will that be determined?

22             THE COURT:  That will be in Knoxville unless you

23   want it somewhere else.

24             MR. HAMILTON:  I think we prefer Knoxville.

25             THE COURT:  Okay.

1          MR. YARBROUGH:  I think that would be appropriate.

2          THE COURT:  Okay.  It will be 1:30 on September 24th

3    in Knoxville.

4          At some point, Mr. Ralenkotter, we'll go over how

5    the presentence report works.  The gist of it is that

6    probation will interview you at some point once we set a

7    schedule.  You'll meet with them, you can have your counsel

8    present, and then that kind of kicks off where they do their

9    investigation.

10          They provide a presentence report to me, and then

11    your counsel and the United States can object and probation

12    will first determine that and if the objections can't be

13    resolved, I'll determine that.

14          Do you have any questions about that process?

15          MR. RALENKOTTER:  No, sir.

16          THE COURT:  At some point we'll set the date for

17    that, but right now, we'll wait until September 24th to

18    discuss that, okay?

19          Anything else we need to cover at this time?

20          MR. YARBROUGH:  No, Your Honor.  Thank you.

21          THE COURT:  Thank you.

22          MR. HAMILTON:  No, Your Honor.

23          THE COURT:  Okay.  Thank you all.  I'll see you on

24    September 24th.

25                         (End of Proceedings.)

1                    REPORTER'S CERTIFICATION

2        STATE OF TENNESSEE    )
                               )
3        COUNTY OF HAMILTON    )

4            I, TIFFANY ASHTON, LCR #625, Licensed Court Reporter and

5        notary public, in and for the State of Tennessee, do hereby

6        certify that the above hearing was reported by me, transcribed

7        by me, and that the foregoing 60 pages of the transcript is a

8        true and accurate record to the best of my knowledge, skills,

9        and ability.

10           I further certify that I am neither of kin nor of counsel

11       to any of the parties nor in any way financially interested in

12       the outcome of this case.

13           I further certify that I am duly licensed by the

14       Tennessee Board of Court Reporting as a Licensed Court

15       Reporter as evidenced by the LCR number and expiration date

16       following my name below.

17           IN WITNESS WHEREOF, I have hereunto set my hand and

18       affixed my Notarial Seal this 8th day of July, 2013.

19

20       _____
         Tiffany Ashton, LCR #625
21       LCR Expiration Date:  06/30/2014
         Notary Commission Expires:  09/14/2014
22       Miller & Miller Court Reporters
         12804 Union Road
23       Knoxville, Tennessee 37934
         Phone:  865-675-1471
24       Fax:  865-675-6398
         E-mail:  Jmccon3590@aol.com

25